Filed 6/26/15 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| SISKIYOU COUNTY FARM BUREAU,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DEPARTMENT OF FISH AND WILDLIFE,<br><br>Defendant and Appellant. | C073735<br><br>(Super. Ct. No. SC CV CV 11-00418)<br><br>MODIFICATION OF OPINION UPON DENIAL OF PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 4, 2015, be modified as follows:

1. On page 4 in the last sentence of the first paragraph, the words "based on" are to be replaced with words "related to but not limited by" so that the sentence now reads:

1

The purportedly new interpretation referenced by the complaint was related to but not limited by the Stopher criteria, which presumed that *any* diversion of water within the relevant watershed was a *substantial* diversion within the meaning of section 1602.

As modified, the petition for rehearing is denied.  This modification does not change the judgment.


FOR THE COURT:


     ROBIE     , Acting P. J.


     MURRAY     , J.


     DUARTE     , J.

Filed 6/4/15 (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| SISKIYOU COUNTY FARM BUREAU, | C073735 |
| Plaintiff and Respondent, | (Super. Ct. No. SC CV CV 11-00418) |
| v. | |
| DEPARTMENT OF FISH AND WILDLIFE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Siskiyou County, Karen L. Dixon, Judge. Reversed with directions.

Kamala D. Harris, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Randy L. Barrow, Deputy Attorney General, Gary Alexander, Ali A. Karaouni, and Deborah L. Barnes, Deputy Attorneys General, for Defendant and Appellant.

David R. Owen for Law Professors as Amicus Curiae on behalf of Defendant and Appellant.

Shute, Mihaly & Weinberger, Ellison Folk and Amy J. Bricker; Trout Unlimited and Brian J. Johnson for California Trout as Amici Curiae on behalf of Defendant and Appellant.

1

Earthjustice, Trent W. Orr and Wendy S. Park for Karuk Tribe, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, and Klamath Riverkeeper as Amici Curiae on behalf of Defendant and Appellant.

Michael A.M. Lauffer, Chief Counsel, Andrew H. Sawyer, Assistant Chief Counsel, Carlos A. Mejia and Nicole L. Kuenzi, Staff Counsel for State Water Resources Control Board as Amicus Curiae on behalf of Defendant and Appellant.

Briscoe Ivester & Bazel and David Ivester; Law Office of Darrin W. Mercier and Darrin W. Mercier for Plaintiff and Respondent.

Somach, Simmons & Dunn and Daniel Kelly for Northern California Water Association as Amicus Curiae for Plaintiff and Respondent.

Pacific Legal Foundation, M. Reed Hopper and Anthony L. François for Pacific Legal Foundation and California Cattlemen's Association as Amici Curiae on behalf of Plaintiff and Respondent.

The Department of Fish and Wildlife (Department) appeals from a judgment in favor of the Siskiyou County Farm Bureau (Farm Bureau), interpreting a statute requiring notification when an entity plans to "substantially divert" water from a river or stream.

We shall reverse because the trial court incorrectly found the statute, Fish and Game Code section 1602,[1] to be ambiguous, and then resolved the perceived ambiguity in a manner inconsistent with the plain language of the statute.

Regardless of an entity's legal right to *take* water, such as for agricultural purposes, and regardless of whether the taking alters the streambed itself, section 1602 unambiguously requires *notification* to the Department if an entity plans to "substantially divert" water. After notification, a statutory mechanism--arbitration followed by court review--exists to resolve disputes about diversions. This notification requirement neither encroaches on any entity's water rights, nor impairs the powers and duties of the State

___

[1] Further undesignated section references are to the Fish and Game Code.

2

Water Resources Control Board (Board), which has filed an amicus brief fully supporting the Department's position.[2]

As we will explain, the trial court appears to have been led astray by a questionable and aborted enforcement policy issued by a single Department employee (the "Stopher criteria"), as well as the deluge of extrinsic material proffered by the Farm Bureau in its effort to demonstrate a latent ambiguity in the statute. As we have recently cautioned, although extrinsic evidence may reveal a latent ambiguity in a statute, such ambiguity must reside in the statutory language itself. It cannot exist in the abstract, or by ignoring the statutory language. (See *Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1179-1180, 1188-1190, 1195 (*Alameda*).) Here, the extrinsic evidence reveals no ambiguity in the statute: The term "divert" had a long-established meaning in the context of water law before enactment of the statute, and we presume the Legislature was aware of that meaning when it used divert as it did in section 1602.

If the Farm Bureau and allied amici curiae believe the statute as written reflects poor public policy, a remedy lies "on the other side of Tenth Street, in the halls of the Legislature." (*Osborn v. Hertz Corp.* (1988) 205 Cal.App.3d 703, 711.)

## PROCEDURAL BACKGROUND

The Farm Bureau filed a complaint for declaratory relief alleging that for over a century "ranchers and farmers in Siskiyou County have extracted water from streams and rivers to irrigate crops and pastures, to water livestock, and for use in their homes and

---

[2] Amici curiae allied with the Department include: 1) the Board; 2) a group of prominent law professors from several California law schools; 3) the Karuk Tribe, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, and Klamath Riverkeeper; and 4) California Trout and Trout Unlimited. Amici curiae allied with the Farm Bureau include: 1) the Northern California Water Association; and 2), the Pacific Legal Foundation and the California Cattlemen's Association.

businesses.  Not until now, some fifty years after the legislature adopted . . . sections 1600 et seq., has [the Department] asserted that [such extraction] requires compliance with section 1602 regardless of whether there is any alteration of a river, stream, or lake." Farmers and ranchers either had to comply with this new interpretation or risk "civil and criminal prosecution.  For this reason, [the Farm Bureau] brings this action for declaratory relief to clarify the rights and duties of its members under . . . section 1602 who do not alter the streambed in exercising their water rights."  The purportedly new interpretation referenced by the complaint was based on the Stopher criteria, which presumed that *any* diversion of water within the relevant watershed was a *substantial* diversion within the meaning of section 1602.

The Department unsuccessfully moved for judgment on the pleadings, and the parties then contested whether or not the statute--as proposed to be applied--was ambiguous.  The trial court found it was.

To resolve the question of statutory ambiguity, the trial court considered extrinsic evidence and resolved the purported ambiguity against the Department, which timely appealed from a judgment prohibiting it from "bringing enforcement action against agricultural water diverters for failing to notify the department of the diverter's intention to lawfully exercise his water right absent alteration to the bed, bank, or stream."

**DISCUSSION**

The trial court found the statute's plain meaning supported the Department's view that the word divert encompassed diversions that did not alter the streambed itself, but found there was a latent ambiguity and applying the plain meaning would lead to absurd results, raise doubts about the constitutionality of the statute, and cause a conflict between the Department's duties and the Board's duties.

We agree with the trial court that the plain meaning of the statute supports the Department's position.  Our agreement, however, ends there.  Although the Department's interpretation of the statute plausibly accounts for the statutory language, the Farm

4

Bureau has not proffered a candidate of meaning that also *plausibly* accounts for the statutory language, and therefore has failed to show an ambiguity in the statute when the rules governing statutory ambiguity are correctly applied. None of the extrinsic evidence tendered by the Farm Bureau changes this conclusion. We reject the trial court's conclusion that the absurd result or constitutional doubt rules require departing from the plain meaning of the statute, as well as its finding that application of section 1602's plain meaning would allow the Department to intrude into the Board's bailiwick.

We shall reverse with directions to enter judgment in favor of the Department.

I

*The Meaning of Divert in Section 1602*

Section 1602 now provides in relevant part:

> "An entity may not substantially divert or obstruct the natural flow of, or substantially change or use any material from the bed, channel, or bank of, any river, stream, or lake, or deposit or dispose of debris, waste, or other material containing crumbled, flaked, or ground pavement where it may pass into any river, stream, or lake, unless all of the following occur [listing notification and other requirements.]" (§ 1602, subd. (a).)

The trial court found the plain meaning of divert as used in section 1602 was broad and supported the Department's position herein. Yet the trial court then found a latent ambiguity in the term. As we now explain, there is no semantic ambiguity as posited by the Farm Bureau, latent or otherwise.

First, we review some basic principles of California water law, to establish the background for the specific legislation at issue. (Part I-A, *post*.) Next, we briefly describe the devastating effect of the Gold Rush on California's rivers and streams, again to provide background for the relevant legislation. (Part I-B, *post*.) We then describe the history of section 1602. (Part I-C, *post*.) We then discuss early interpretations of section 1602. (Part I-D, *post*.) Finally, we consider whether any proffered extrinsic evidence establishes an alternative equally plausible candidate of meaning of divert as used in

5

section 1602, and conclude no such alternative meaning has been demonstrated. (Part I-E, *post*.)

A. *Basic California Water Law Principles*

Because the trial court spent much time on basic water law principles which are assumed by the parties, we provide the reader with a brief summary, taken from a recent case:

> "Ownership of California's water is vested generally in the state's residents, but individuals and entities can acquire 'water rights,' the right to divert water from its natural course for public or private use. [Citations.] California maintains a 'dual system' of water rights, which distinguishes between the rights of 'riparian' users, those who possess water rights by virtue of owning the land by or through which flowing water passes, and 'appropriators,' those who hold the right to divert such water for use on noncontiguous lands. [Citation.] For historical reasons, California further subdivides appropriators into those whose water rights were established before and after 1914. Post-1914 appropriators may possess water rights only through a permit or license issued by the Board, and their rights are circumscribed by the terms of the permit or license. . . .

> [¶] . . . [¶]

> "The nature of the water rights held by riparian users and appropriators differs in several ways. Most pertinent to the matter at hand are the limits placed on diversion. Although riparian users must share with other riparian users on the watercourse, there is no predetermined limit on the amount of water an individual riparian user may divert, so long as the uses to which the diverted water is put are riparian, beneficial, and reasonable. [Citation.] Appropriators, in contrast, may divert only so much water as is authorized by their particular water right. . . .

> [¶] . . . [¶]

> "[W]ater use by both appropriators and riparian users is limited by the 'reasonable use' doctrine, which forbids the waste of water or its unreasonable use." (*Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879, 888-890, fns. omitted.)[3]

---

[3] California's water rights system is not really dual but is instead tripartite, because some pueblo rights superior to riparian or appropriative rights exist. (See Hutchins, The Cal.

In addition, the public trust doctrine vests the state with sovereign authority over all navigable waterways. (See *Audubon*, *supra*, 33 Cal.3d at pp. 433-441.) "It is an affirmation of the duty of the state to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust." (*Id.* at p. 441.) An overarching principle is that "the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent to which they are capable, and that the waste or unreasonable use of water must be prevented [citations]. [¶] Just as the State of California holds all of its navigable waterways and the lands lying beneath them as a trustee of a public trust for the benefit of the People [citation], the state acts as a trustee of all waters for the benefit of the People of the State [citation]." (*People v. Weaver* (1983) 147 Cal.App.3d Supp. 23, 28-29, fn. omitted (*Weaver*).)[4]

In all contexts, water use must be reasonable, as stated by our Supreme Court:

---

Law of Water Rights (1956) Pueblo Water Right, pp. 256-262 (Hutchins).) A useful expanded summary of the history of California water law is provided by *Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, at pages 750-754 (*Pleasant Valley*).

[4] The parties seem to assume the relevant waterways are navigable, but do not explicitly so state. *Audubon* did not consider "whether the public trust extends for some purposes--such as protection of fishing, environmental values, and recreation interests--to nonnavigable streams." (*Audubon*, *supra*, 33 Cal.3d at p. 437, fn. 19.) But a separate line of authority holds that *fish* are subject to a species of the public trust doctrine. (See *People v. Monterey Fish Products Co.* (1925) 195 Cal. 548, 563; *California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 630 (*California Trout*).)

Although we agree with amicus curiae Northern California Water Association's assertion that the state does not "own" all water, rather, the water is owned by the *people* of California (see Wat. Code, § 102 ["All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law"]; see *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1022-1028 [insurance coverage case]), we find this distinction to be of no relevance to our decision.

"It is well established that what is a reasonable use of water varies with the facts and circumstances of the particular case. [Citations.] [T]he reasonableness of a riparian use cannot be determined without considering the effect of such use on all the needs of those in the stream system [citation], nor can it be made '*in vacuo* isolated from statewide considerations of transcendent importance.' [Citation.] These statewide considerations are that 'limited water resources be put only to those beneficial uses "to the fullest extent of which they are capable," that "waste or unreasonable use" be prevented, and that conservation be exercised "in the interest of the people and for the public welfare." (Cal. Const., art. XIV, § 3 [now art. X, § 2].)' " (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 354 (*Long Valley*); see *Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1479-1480.)

B. *The California Gold Rush and Aftermath*

"Over [150 years ago], gold drew throngs of adventurers to early mining communities in the Sierra Nevada. When the halcyon years were over, a few earnest argonauts decamped and went to the river bottoms, and pointed great water cannons, called monitors, at the hillsides hoping to dislodge sparkles of gold from the sandy detritus . . . . [¶] Although considerable quantities of gold washed down and were separated from the gravel, the hydraulic mines annually discharged 600,000 cubic yards of debris, which soon choked the American and Sacramento Rivers with tailings, raised the beds of these rivers, impairing navigability, fouling the waters, and angering farmers. [¶] Amid political turmoil, the matter finally reached our high court, which held that an injunction should issue, based upon the premise that the rights of the people in navigable rivers were paramount, and that any intrusions upon that right constituted a nuisance." (*Weaver*, *supra*, 147 Cal.App.3d Supp. at p. 30; see *Audubon*, *supra*, 33 Cal.3d at p. 436 [damage from mining debris]; *Paterno v. State of California* (2003) 113 Cal.App.4th 998, 1004-1005 [observing that the "damage [from hydraulic mining] is indescribable, and must be seen at the Malakoff Diggins State Historic Park to be believed"].)

C. *The Origin of Section 1602*

The injunctive relief just mentioned (see *People v. Gold Run D. & M. Co.* (1884) 66 Cal. 138; see also *Woodruff v. North Bloomfield G. Min. Co.* (1884) 9 Sawy. 441, 18 Fed. 753) had significant consequences:

> "[These] decision[s] led to the virtual demise of hydraulic mining, and the Legislature finally responded by declaring that hydraulic mining could only be carried on if it could be done without material injury to navigable streams or the lands adjacent thereto [citation]. . . .  In addition, one who desires to [deflect], alter or divert the course of a nonnavigable stream in any surface mining dredging operation must obtain the approval of the board of supervisors [citation].

> "Turning our attention to the immediate origins of [section 1602], it appears over the years, the Legislature, concerned with the decline in the fish population, enacted a number of laws including those, 1) prohibiting persons from depositing any substance or material deleterious to fish where it could pass into the waters of the state [citations], 2) prohibiting mining operations in the Trinity and Klamath game district for four months each year, except when mining debris could not pass into the waters, [citation], 3) making it unlawful to construct or maintain devices in certain streams which impeded the passing of fish up and down the stream [citation], 4) authorizing the Fish and Game Commission to require the owner of any new or enlarged dam to install and maintain fishways [citations], and, 5) allowing access to waters impounded by a dam to fishermen during the open season [citations].

> "Despite these efforts, siltation caused by the removal and washing of aggregate seriously affected anadromous fish, such as salmon and steelhead, by preventing spawning and suffocating eggs and fry.  Aggregate operations had rendered certain portions of the Tuolumne River useless for spawning and placed the American River in jeopardy.  [Citations.]

> "Therefore, the Legislature enacted [section 1602] which makes it unlawful to substantially divert or obstruct the natural flow, or substantially change the bank, of any stream or lake, or to use any material from the streambeds, without first notifying the Department.  Section 1601 . . . also requires governmental entities to notify the Department of any project which will divert, obstruct or change the natural flow of any river, stream or lake, or if there is at any time a fish or wildlife resource, or from which these resources derive benefit, or when the project will use materials from streambeds designated by the Department [citation]." (*Weaver*, *supra*, 147 Cal.App.3d Supp. at pp. 31-32, fn. omitted.)

The purpose of remediating adequate spawning reaches for anadromous fish was detailed in a 1959 legislative report introduced as extrinsic evidence at trial. (Sen. Permanent Fact Finding Com. on Natural Resources (1961 Reg. Sess.).) We will refer to this as the Senate Report.

Originally enacted as part of a new Chapter 6 of Division 2 of the code, former section 1602 provided in significant part: "Any person who substantially diverts or obstructs the natural flow or substantially changes the bed, channel or bank of any river, stream or lake, or uses any material from the streambeds, shall notify the department of such operations, except when the department has been notified pursuant to Section 1601. The department within 30 days of receipt of such notice, or within the time determined by mutual written agreement, shall submit to the person its recommendations as to measures necessary to protect fish and wildlife." (Stats. 1961, ch. 909, § 2, p. 2532.)[5]

As we have explained in a prior case, in 1970 the Legislature prohibited diversions until an agreement was reached with the Department, and arbitration provisions were added to facilitate disputes. We emphasized that violations of the section, then renumbered 1603 (Stats. 1970, ch. 1357, § 2, p. 2524), "either by failure to notify the Department of a project or by refusing to incorporate the Department's proposed project modifications or the decision of the arbitration panel into the project, became a misdemeanor" (*Willadsen v. Justice Court* (1983) 139 Cal.App.3d 171, 176 (*Willadsen*)).

In 1976, Chapter 6 was repealed and revised (Stats. 1976, ch. 603, §§ 1-2, pp. 1447-1451), and by regulation the Department declared "all rivers, streams, lakes, and streambeds" to be subject to its provisions. (See *Willadsen*, *supra*, 139 Cal.App.3d at p.

---

[5] We deem references in some authorities to section 1603--the statute's number between 1970 and 2003--to refer to section 1602, as do the parties. (See *People v. Osborn* (2004) 116 Cal.App.4th 764, 767, fn. 1 (*Osborn*).) Similarly, references to the Department of Fish and Game are to the Department.

175; see *id*. at pp. 173-175.) In 2003, Chapter 6 was again repealed and revised, rewriting its sections to read as they do at present. (See Stats. 2003, ch. 736, § 2, pp. 5522-5532.)

As relevant to the current dispute, section 1602 can be parsed to read as follows:

"An entity may not [1] substantially divert or obstruct the natural flow of, or [2] substantially change or use any material from the bed, channel, or bank of, any river, stream, or lake, or [3] deposit or dispose of debris, waste, or other material . . . where it may pass into any river, stream, or lake [absent, *inter alia*, notification to the Department]."

The Legislature has declared section 1602's explicit legislative purpose to be as follows: "The Legislature finds and declares that the protection and conservation of the fish and wildlife resources of this state are of utmost public interest. Fish and wildlife are the property of the people and provide a major contribution to the economy of the state, as well as providing a significant part of the people's food supply; therefore their conservation is a proper responsibility of the state. This chapter is enacted to provide conservation for these resources." (§ 1600; Stats. 2003, ch. 736, § 2, pp. 5522-5523.) With insubstantial changes, this is the same purpose as when the statute was first enacted. (See Stats. 1961, ch. 909, § 2, p. 2532.)[6]

D. *Early Interpretations of Section 1602*

Questions soon arose surrounding the interpretation of "substantially" and "divert." Some argued that substantially was too vague, and some, including the Farm Bureau and allied amici curiae, contend divert refers to diverting *the streambed itself*, and not merely pumping (or otherwise taking) water therefrom. Although divert is the key

---

[6] Although relevant only in cases of demonstrated ambiguity, "laws providing for the conservation of natural resources are to be given a liberal construction." (*Outfitter Properties, LLC v. Wildlife Conservation Bd*. (2012) 207 Cal.App.4th 237, 245; see *Blumenfeld v. San Francisco Bay Conservation etc. Com*. (1974) 43 Cal.App.3d 50, 56.)

term for our purposes, some discussion of both terms is necessary to fully understand the contentions on appeal.

The claim that the word substantially was too vague was easily rejected. (See *Rutherford v. State of California* (1987) 188 Cal.App.3d 1267, 1279 (*Rutherford*); *Weaver*, *supra* 147 Cal.App.3d Supp. at pp. 36-38.) "The term 'substantial' has assumed a commonly understood meaning as characterizing something as ample or of considerable amount, quantity or size; while within the legal context, it has been defined as important or material and of considerable amount or value rather than inconsequential or small." (*Rutherford*, at p. 1279.) "[I]t is the role of the Department to determine whether the individual's proposed activity will affect the existing fish or wildlife resources. Consequently, because notice is required under the statute before an individual acts and equally mindful of the breadth of the ordinance, this determination rests upon the Department and not the individual. In other words, there exists no due process consideration regarding an individual's conformity with the strictures of the statute." (*Id.* at p. 1280, fn. 4.)

The notification leads to arbitration if the parties cannot agree whether a substantial diversion has occurred or what remedial measures suffice, and the arbitral result is subject to judicial review. (See §§ 1603, 1604; Code Civ. Proc., § 1285; see *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 518 [describing the notification and protest procedure]; see *Osborn*, *supra*, 116 Cal.App.4th at p. 771 [purpose of notice "is so the Department can ensure that fish and wildlife resources are protected"].)[7]

---

[7] One case suggested the method of review would be a petition for writ of mandate (Code Civ. Proc., § 1094.5) to challenge permit conditions. (*Rutherford*, *supra*, 188 Cal.App.3d at p. 1286.) We express no view of the viability of that mechanism.

As for the term divert, the California Attorney General and one court have impliedly or directly invited the Legislature to clarify its meaning, to no avail.

In 1973, the California Attorney General considered, inter alia, whether a "person diverting water from a stream by means of a pump" was subject to former section 1602. (See 56 Ops.Cal.Atty.Gen 360 (1973).) While discussing related questions, the Attorney General pointed out that "the same factor which provides for steelhead and salmon spawning beds is that which attracts aggregate companies, an abundance of gravel. The Legislature was specifically concerned over the protection of salmon and steelhead spawning gravels from adverse aggregate operations when sections 1600 through 1603 were originally enacted in 1961." (*Id.* at p. 362, citing the Senate Report.) "Many spawning riffles that are used by salmon and steelhead during high flows are completely dry and exposed during low summer flows. . . . [¶] . . . [¶] Aggregate companies during the long summer months can and do operate in these dry areas located in the flood plain and remove such gravel used for spawning in the winter. It is clear that a legislative purpose of [former] section 1602 was to protect gravels used by salmon and steelhead for spawning from aggregate operations." (*Id.* at p. 363.)

In language relevant to this appeal, the 1973 Attorney General opinion finds:

> "Section 1602 applies to 'any person who substantially diverts . . . the natural flow . . . of any river, stream . . . .'

> "Of course this provision applies to *any method of diversion*. The difficult question is what constitutes a 'substantial' diversion of the natural flow. At least two possible detrimental effects on fish and wildlife resources come to mind. Pump diversions can divert all of the flow of a stream thus dewatering the area downstream. Pump diversions can also suck in small fish.

> "Any pump diversion or series of pump diversions that are capable of dewatering a stream at extreme low summer flows or greater flows, or could result in detriment to fishlife in the stream because of flow reduction would constitute substantial diversion of the natural flow and thus come within the purview of [former] section 1603.

13

"All pump diversions are capable of diverting small fish, fry and eggs out of a stream, river, or lake but a general rule cannot be laid down for what would constitute a substantial diversion, because of the innumerable factual variations." (56 Ops.Cal.Atty.Gen., *supra*, at pp. 364-365, italics added.)[8]

Thus, the 1973 Attorney General opinion concluded that mere pumping qualified as a diversion under the statute, but added the caveat that whether a diversion was substantial depended on the specific facts of each case.

Ten years later, *Weaver* (decided in 1983) contained a cautionary dictum, albeit in the context of defining *substantial* rather than *divert*:

"In enacting [former section 1602], we feel confident that the Legislature was not concerned with children skipping rocks across a stream, or building sand castles, or hikers dislodging a few stones as they climbed the bank of a river. On the contrary, by using the word substantially, the Legislature certainly intended to prohibit an owner from bulldozing material in a streambed which would cause the stream to change its course materially, *or a like change which might interfere with the spawning grounds of anadromous fish*, unless the plans were first approved by the Department (or found to have an insignificant effect upon the ecosystem in the vicinity of the projected change). Our conclusion is fortified by the language which prohibits using any material from the streambeds unless the Department was notified. Therefore, a person moving sand or gravel from a streambed acts at his peril unless he or she first notifies the Department.

"We acknowledge that there are grounds for valid differences of opinion as to what constitutes a substantial diversion of the natural flow of a stream. This same issue troubled the Attorney General a decade ago, and apart from the problem of quantifying what is meant by a substantial diversion, *we wonder how this particular prohibition may affect farmers who exercise riparian rights and who might be wholly unaware of this law*. We suggest that this subject merits reconsideration by the Legislature." (*Weaver*, *supra*, 147 Cal.App.3d Supp. at pp. 37-38, italics added.)

Thus, *Weaver* raised a concern that the statute might have been written more broadly than intended, because it could be read to cover ordinary agricultural pumping,

---

[8]  The next year, another opinion concluded criminal liability could ensue, in part, should a person "*divert or obstruct* a stream or river and then willfully fail to notify" the Department.  (57 Ops.Cal.Atty.Gen. 475, 476 (1974), italics added.)

without movement of gravel or obstruction of a spawning reach.  There was no legislative action to address the concerns expressed by *Weaver* or by the earlier Attorney General opinion.

For multiple reasons, we agree with the conclusion of the 1973 Attorney General opinion that section 1602 plausibly encompasses pumping.

First, the phrase "any person" refers to *every person or entity* who substantially diverts water.  "Generally, 'any' means *all* or *every*.  'From the earliest days of statehood the courts have interpreted "any" to be broad, general, and all embracing.'  (*Burnsed v. State Bd. of Control* (1987) 189 Cal.App.3d 213, 217; see *Emmolo v. Southern Pacific Co*. (1949) 91 Cal.App.2d 87, 92 ['the use of the word "any" in the statute negatives the contention that the statute is restricted . . . '].)"  (*California Grocers Assn. v. Department. of Alcoholic Beverage Control* (2013) 219 Cal.App.4th 1065, 1078 (conc. opn. of Duarte, J.).)

Moreover, we cannot overlook the use of "or" in the statute, first appearing in the clause referencing an act to "substantially divert *or* obstruct" water.  (§ 1602, subd. (a), italics added.)  The usage of "or" between divert and obstruct, unaccompanied by any indication that what follows is qualified, "indicates an intention to use [the word "or"] disjunctively so as to designate alternative or separate categories."  (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680; see *Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1, 30.)  Thus, the later references in the statute to gravel etc. do not operate to limit the word divert.  Another significant "or" occurs later in the same sentence:  "An entity may not substantially divert or obstruct the natural flow of, *or substantially change or use any material* from the bed, channel, or bank of" any stream or river.  (§ 1602, subd. (a), italics added.)  This shows a difference between "divert or obstruct" and "substantially change" and shows that a proposed activity that *either* will "divert or obstruct" *or* "substantially change or use any material from" the streambed is covered by the statute.  Similarly, a third activity, one that will "deposit or dispose of

15

debris, waste, or other material" into a stream may trigger a notification requirement. (§ 1602, subd. (a).) The placement of commas confirms our reading, as they "are used to separate items in a list." (*Board of Trustees v. Judge* (1975) 50 Cal.App.3d 920, 927, fn. 4.)

Further, whether a diversion is substantial cannot be answered in the abstract, but depends on the innumerable factual variations as stated by the 1973 Attorney General opinion. Some of these considerations are the amount of water taken relative to the supply, the use to which such water is applied, the historical usage by the diverter and predecessors, and the needs of the fish, given the palpable fact that--due to yet another in a series of recurring drought conditions in California--there simply is not enough water to satisfy all legitimate needs. But this does not import into the statute an exemption for diversions by pumping.

Finally, " 'Opinions of the Attorney General, while not binding, are entitled to great weight. [Citations.] In the absence of controlling authority, these opinions are persuasive "since the Legislature is presumed to be cognizant of that construction of the statute." ' " (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 (*Rank*); see *Meyer v. Board of Trustees* (1961) 195 Cal.App.2d 420, 432 ["It must be presumed that the aforesaid interpretation has come to the attention of the Legislature, and if it were contrary to the legislative intent that some corrective measure would have been adopted in the course of the many enactments on the subject in the meantime"]; see also *People v. Gjersvold* (2014) 230 Cal.App.4th 746, 751; see *Rank*, at p. 17.)

The Legislature could easily have amended section 1602 if it perceived an interpretive problem. Indeed, as the trial court in this case observed, *Weaver* asked the Legislature to clarify what constituted a substantial diversion under the statute (*Weaver*, *supra*, 147 Cal.App.3d Supp. at pp. 33, 38), yet the Legislature did not do so. Thus it impliedly embraced the Attorney General's interpretation, by declining to clarify the language at issue despite revising the statute in other ways over the years.

16

Interpreting the term divert as used in section 1602 to embrace diversions of water without alteration of or damage to the streambed itself is the most natural reading of the statute. However, although the Department has proffered this reading as a plausible candidate of meaning of the statute, we must examine other sources, including provisionally examining extrinsic sources, to determine if the Farm Bureau has tendered an *equally plausible* candidate of meaning and determine if an ambiguity exists.

E. *The Proffered Alternate Candidate of Meaning of Divert*

The next question is whether the Farm Bureau has proffered a plausible candidate of meaning, and thus has raised an ambiguity in the statute, latent or patent. " 'A claim of latent ambiguity requires a provisional examination of extrinsic matters to make the judgment whether the claim is tenable.' " (*Alameda*, *supra*, 213 Cal.App.4th at p. 1180.) The Farm Bureau would read section 1602 to exclude activities that take water without disturbing the streambed or bank. Several types of extrinsic evidence were considered by the trial court and are proffered on appeal in support of this candidate. But before discussing the particular categories of extrinsic evidence, we briefly discuss what ambiguity is, and how it is shown.

The question of statutory ambiguity is not merely a linguistic question--although it *is* that--it is a question striking at the heart of California's lawmaking system. "The Legislature may make no law except by statute and may enact no statute except by bill." (Cal. Const., art. IV, § 8; see *People's Advocate Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 325-326.) A statute is *the* mechanism for exercising legislative power. Thus, statutory language is *the* measure of its meaning, and not some progenitor, be it the author of a precursor bill, or detritus from the legislative process. (See, e.g., *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 742; *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699-701.) Therefore, "[i]f the meaning of a statute can be declared without the support of a statutory text, the law is not made 'by' the statute, it is made by the courts in violation of the Constitution." (*City of*

17

*Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 795 (*Sacramento*).)

Thus, legislative history--a term now broadly used to mean the background materials that precede the enactment of a particular bill--is *irrelevant* unless it aids in resolving an ambiguity in the statutory language. (See *People v. Snook* (1997) 16 Cal.4th 1210, 1215 [absent ambiguity "we presume the Legislature meant what it said and the plain meaning of the statute governs"].)

"An ambiguity arises only if ' . . . there [is] more than one construction in issue which is semantically permissible, i.e., more than one usage which makes sense of the statutory language given the context and applicable rules of usage.' " (*Sacramento*, *supra*, 22 Cal.App.4th at p. 795; see *Alameda*, *supra*, 213 Cal.App.4th at pp. 1179-1180; *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 177 Cal.App.3d 855, 859, fn. 1 [same rule obtains regarding contractual ambiguity].)

It is true that "[p]art of a fair reading of statutory text is recognizing that 'Congress [or the Legislature] legislates against the backdrop' of certain unexpressed presumptions." (*Bond v. United States* (2014) 572 U.S. __, __ [189 L.Ed.2d 1, 12].) But ambiguity is not shown by unexpressed presumptions unrelated to statutory *text*. "In determining whether language is ambiguous it is *essential* to tether extrinsic evidence to particular language: ' "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning *to which the language of the instrument is reasonably susceptible*." ' [Citation.] Therefore, if ' "the language of the instrument" ' cannot carry the meaning ascribed to it by the party claiming an ambiguity, ' "the case is over." ' " (*Alameda*, *supra*, 213

Cal.App.4th at pp. 1188-1189, quoting from *Dore v. Arnold Worldwide, Inc*. (2006) 39 Cal.4th 384, 391-393.)**9**

Moreover, the fact that " ' "a statute can be applied in situations not expressly anticipated by [the Legislature] does not demonstrate ambiguity.  It demonstrates breadth." ' " (*Estate of Earley* (2009) 173 Cal.App.4th 369, 376; see *Souza v. Lauppe* (1997) 59 Cal.App.4th 865, 873-874.)

" 'An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence.'  [Citation.]  'A claim of latent ambiguity requires a provisional examination of extrinsic matters to make the judgment whether the claim is tenable.'  [Citations.]  [¶]  *If* extrinsic evidence factually conflicts, the trial court's resolution of that conflict is reviewed for substantial evidence, otherwise the trial court's . . . interpretation . . . is reviewed de novo." (*Alameda*, *supra*, 213 Cal.App.4th at p. 1180.)

With this understanding, we now examine the extrinsic evidence to determine if it shows the Farm Bureau's interpretation plausibly accounts for the statutory language so that its interpretation stands in relative equipoise to the Department's.

### 1. Dictionary definitions

"The dictionary is a proper source to determine the usual and ordinary meaning of words in a statute." (*Humane Society of U.S. v. Superior Court* (2013) 214 Cal.App.4th 1233, 1251.)  As we have explained in a prior case, relevant dictionary definitions are those extant before or at least near in time to the statutory or contractual usage.  (See *Alameda*, *supra*, 213 Cal.App.4th at p. 1188.)

---

**9**  Although *Alameda* involved contract language, the contract was authorized by the Legislature and later ratified by the People, and therefore carried the force of statutory law.  (See *Alameda*, *supra*, 213 Cal.App.4th at p. 1172; see *id*. at p. 1186 [contract "by virtue of the manner of its confirmation by the people and the Legislature is akin to a statute"].)

Before the enactment of the original statute, diversion meant: "A turning aside or altering the natural course of a thing" (1 Bouvier's Law Dict. (8th ed. 1914), p. 898, col. 1), "turning of a watercourse *or a part of it* out of its natural channel" (Ballentine's Law Dict. (2d ed. 1948) p. 391, col. 2, italics added), and "*taking water* from the channel in which it flows" (1 Cal. Digest Words & Phrases (Bancroft-Whitney 1960) p. 531, col. 2, italics added).

Thus the dictionary definitions, although not dispositive, strongly favor the Department's candidate of meaning.

2. Common law and judicial definitions

Before the adoption of section 1602, the usage of divert in the context of California water law was entirely consistent with the Department's interpretation, and undermines the Farm Bureau's.

Leading California water treatises emphasize " 'It is immaterial . . . whether the water was taken from the river by means of a canal, ditch, flume, or pipe, or by any other method.' It is the fact of diversion, and not the mode, that is material." (Hutchins, *supra*, Exercise of Appropriative Right, p. 162, fn. omitted; see 1 Rogers & Nichols, Water for Cal. (1967) § 172, p. 233 ["riparian owner can divert water . . . in any way he desires as long as he does not take more than his reasonable share"]; see *id.*, Appropriative Water Rights, §§ 204-206, pp. 294-298 [same rule for appropriators].)

A statutory definition flowing from a source predating section 1602, Water Code section 1706 (Stats. 1943, ch. 368, § 1706, p. 1629), provides: "The person entitled to the use of water by virtue of an appropriation . . . may change *the point of diversion*, place of use, or purpose of use if others are not injured by such change . . . ." (Italics added.) As the trial court recognized, some cases interpreting this provision involve diverting water for ranching or other agricultural purposes. (See, e.g., *Barnes v. Hussa* (2006) 136 Cal.App.4th 1358, 1364-1365; *Pleasant Valley*, *supra,* 61 Cal.App.4th at pp.

746, 779.) Case law can help define terms, as we have noted in another case involving water law. (*Osborn*, *supra*, 116 Cal.App.4th at p. 773.)

What is more significant about Water Code section 1706 is that equivalent language appeared in former Civil Code section 1412, enacted in 1872, and *that* statute, in turn, codified *then-extant* law. (See Code commrs. note foll. 1 Ann. Civ. Code § 1410 (1st ed. 1872, Haymond & Burch, commrs.-annotators) p. 403 [citing, e.g., *Kidd v. Laird* (1860) 15 Cal. 161]; see Hutchins, *supra*, at pp. 175-177; *Barnes v. Hussa*, *supra*, 136 Cal.App.4th at p. 1368, fn. 7; see also 2 Kinney on Irrigation and Water Rights (2d ed. 1912) § 825, pp. 1448-1449 ["any lawful means" of diversion permitted]; 1 Weil, Water Rights in the Western States (3d ed. 1911) § 501, p. 538 [appropriators]; *id*., § 754, pp. 827-829 [riparians].)

Consistent with such usage, California courts used the term divert to mean the mere taking of water from a channel. (*Miller & Lux v. Enterprise Canal Land Co*. (1915) 169 Cal. 415, 433 [opening headgate "would inevitably divert into the canal water that would otherwise pass into the slough"]; see *Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist.* (1935) 3 Cal.2d 489, 519 [pumping underground water described as a diversion]; Hutchins, *supra*, p. 249 ["Diversion of the water by raising it over the banks of the stream 'by pump, or other similar appliances' has been specifically upheld"]; see also *People v. Glenn-Colusa Irrigation Dist*. (1932) 127 Cal.App. 30, 32 ["diversion . . . by means of a battery of pumps located near the head of the canal"].)

As our Supreme Court has held, discussing riparian rights, "Whatever be the just proportion of water to which any riparian proprietor is entitled, *that proportion cannot be diminished by the fact that in order to utilize it he must raise it from the bed of the stream by pumps, or other similar appliances. Every diversion of water from a stream is artificial--a disturbance of the natural order of things*. A dam or a ditch is as much an artificial mechanism as a pump, it may indeed be much more so; and the one alters the natural conditions in the same sense that the other does. The right to take the water at all

21

is a right to change the ordinary course of nature; and the methods employed, so long as their use does not infringe the like and equal rights of others, are immaterial." (*Charnock v. Higuerra* (1896) 111 Cal. 473, 480-481, italics added.) This broad meaning of diversion has never been changed in California water law. (See *Simons v. Inyo Cerro Gordo Mining Power Co.* (1920) 48 Cal.App. 524, 537; 62 Cal.Jur.3d (2013) Water, § 300, p. 374; *id*, § 154, p. 209 [riparians]; *id.*, § 215, p. 274 [prescriptive rights].)

This reading of divert is consistent with its usage in a case involving the public trust doctrine. As stated by our Supreme Court: " 'If the public trust doctrine applies to constrain *fills* which destroy navigation and other public trust uses in navigable waters, it should equally apply to constrain the *extraction* of water that destroys navigation and other public interests. *Both actions result in the same damage to the public interest.*' " (*Audubon*, *supra*, 33 Cal.3d at pp. 436-437, final italics added, quoting Johnson, *Public Trust Protection for Stream Flows and Lake Levels* (1980) 14 U.C. Davis L.Rev. 233, 257-258, and also citing the following passage of Dunning, *The Significance of California's Public Trust Easement for California Water Rights Law* (1980) 14 U.C. Davis L.Rev. 357, 359-360: "[I]t is clear that diversions sometimes may interfere with navigable waters just as seriously as physical obstacles do and that in such cases the public trust easement may logically be invoked to protect the public uses"].) Accordingly, the court held "the public trust doctrine . . . protects navigable waters [like Mono Lake] from harm caused by diversion of nonnavigable tributaries." (*Audubon*, *supra*, 33 Cal.3d at p. 437, fn. omitted.) The mere *diversion* of water from the tributaries triggered the public trust doctrine, because such diversion could damage Mono Lake. Thus, under the public trust doctrine, as under riparian and appropriative rights rules, mere diversion of water--i.e., without changing or obstructing a stream or river--may itself be deleterious.

Thus, the term divert or diversion as used in California water law has always applied to the *taking* of water from a stream or river, and not merely blocking or altering

22

the course of the stream or river itself.  This long-standing usage was presumably known to the Legislature when it considered the 1959 Senate Report, which addressed a bill containing *different* language than that ultimately adopted by the 1961 Legislature and by subsequent statutory revisions.

"When the Legislature enacts language that has received definitive judicial construction, we presume that the Legislature was aware of the relevant judicial decisions and intended to adopt that construction."  (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 675; see *Estate of McDill* (1975) 14 Cal.3d 831, 839.)

Thus, we conclude the common law usage of divert in the water context does not advance but instead refutes the Farm Bureau's tendered candidate of meaning, that would exclude ordinary agricultural pumping.  (See, e.g., *Phelps v. State Water Resources Control Bd.* (2007) 157 Cal.App.4th 89, 93, 97 [upholding civil penalties for unlawful diversion of water for farming purposes, as that term is used in Wat. Code, § 1052, subd. (a)].)  "The entire history of the origin and development of the doctrine of appropriation of water in California, existing alongside the ancient common law concept of riparian rights, demonstrates that appropriation of water in the legal sense involves possession of the water, evidence[d] by some form of diversion or physical control over it.  The courts from the very birth of the legal concept of appropriation of water have uniformly evidenced the basic common element of possession.  Sometimes it is referred to as a 'taking' of water, '*diversion*,' or a 'physical control.' "  (*California Trout, Inc. v. State Water Resources Control Bd*. (1979) 90 Cal.App.3d 816, 819, italics added; see *Jurupa Ditch Co. v. County of San Bernardino* (1967) 256 Cal.App.2d 35, 41 ["Water is not owned until it is taken in a receptacle by the hand of man, or through works of man transferring water from the stream into some facility such as a pond, ditch, flume *or pipeline*" (italics added); cf. *Callens v. County of Orange* (1954) 129 Cal.App.2d 255,

23

259 [flood-control case; "Straightening, widening, or deepening the channel of a stream to improve the drainage entails no diversion of the waters"][10].)

Therefore, it is difficult to conceive that when the Legislature wrote "divert or obstruct," it did not understand that "divert" meant something *other than* "obstruct," because from time immemorial in California to divert meant to take water by *any* reasonable means that did not injure others with lawful rights to the same water.[11]

### 3. Related Statutory Usages

In determining the meaning of divert in section 1602, it is also appropriate to consider how the Legislature has used that or similar terms in related contexts.

Water Code section 5100, subdivision (c), adopted just a few years after section 1602 (see Stats. 1965, ch 1430, § 1, p. 3358), defines diversion within the context of

---

[10] We note subsequent changes to the rules regarding flood control liability (see *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 81-85) and cite *Callens* only to show the common usage of the term divert before 1961.

[11] The Farm Bureau cites cases involving liability for water damage, to show divert includes physically altering a watercourse, but not extracting water. None of those cases pertained to the statute at issue; further, we see nothing in those cases holding that the term divert does *not* encompass mere water extraction. (See *Weaver v. Bishop* (1988) 206 Cal.App.3d 1351 [upholding verdict finding that adding riprap to strengthen creek bank was reasonable, although it damaged other property]; *Ektelon v. City of San Diego* (1988) 200 Cal.App.3d 804, 809 [alleged unreasonable diversion of floodwaters]; *Youngblood v. City of Los Angeles* (1958) 160 Cal.App.2d 481, 486-488 [construction of revetment channeled storm water onto plaintiff's land]; *Clement v. State Reclamation Board* (1950) 35 Cal.2d 628, 636 [liability for one who "obstructs the natural channel of the river"]; *Archer v. City of Los Angeles* (1941) 19 Cal.2d 19, 26 ["there is no diversion if surface waters, flowing in no defined channel, are for a reasonable purpose gathered together and discharged into the stream that is their natural means of drainage even though the stream channel is inadequate to accommodate the increased flow"]*; LeBrun v. Richards* (1930) 210 Cal. 308, 314-315 [" 'one may not obstruct or divert the flow of a natural watercourse' " but *flood waters* are " ' "a common enemy against which every man has a right to defend himself" ' "].) Cases are not authority for propositions not considered. (See *Hart v. Burnett* (1860) 15 Cal. 530, 598.)

24

certain reporting requirements to the Board (see Wat. Code, § 25) to mean "taking water by gravity *or pumping* from a surface stream or subterranean stream flowing through a known and definite channel, or other body of surface water, into a canal, pipeline or other conduit, and includes impoundment of water in a reservoir." (Italics added; see Stats. 2007, ch. 675, § 3, p. 5741 [current version of this statute].) Obviously, pumping water out of a surface or subterranean stream need not alter the streambed itself.

In contrast, Government Code section 40404, subdivision (c), adopted in 1949, well *before* section 1602, authorized local legislative bodies (see Gov. Code, § 34000) to condemn property for "[w]idening, straightening, or *diverting the channels of streams*." (Stats. 1949, ch. 79, § 1, pp. 211-212, italics added.) The qualification that the diversion must pertain to *the channels of streams* shows that the term divert had a broader meaning and that the Legislature was aware of that meaning and wanted to limit it: In regards to condemnation, it did not intend *this* statute to apply to diversions of water *unless* those diversions changed the channels of the streams.

We note with particular interest that a fairly recent statute, enacted in 2012, adds a $10,000 civil penalty to deter diversions contravening section 1602 that are made for the purpose of facilitating production or cultivation of controlled substances on public lands, or while trespassing on private lands. (§ 12025, subd. (a)(1).) In adopting this statute, the Legislature in part found, "Many illegal marijuana growsites include *water diversion with irrigation pipes*, . . . illegal damming and water diversion, and pesticides and insecticides that are sometimes added directly to streams and ponds." (Stats. 2012, ch. 390, § 1(a)(5).) Such "[i]llegal water diversion for the purpose of cultivating marijuana poses a direct threat to California's endangered coho salmon. To prevent their extinction from northern California waters, it is imperative that habitat restoration occurs." (Stats.

25

2012, ch. 390, § 1(a)(6).)[12]  This language shows, consistent with our prior discussion, that the Legislature is aware that diversion can be accomplished with pipes and pumps, and not merely by changing the streambed or course of a stream.

These statutes illustrate that the Legislature is aware of the potentially broad meaning of divert or diversion, and when it wants to specify a particular *form* of diversion, it does so.  The fact that it has never chosen to limit the meaning of divert as used in section 1602 is significant.  The 2012 statute is particularly illuminating, as it strengthens the penalties for violating section 1602, and in doing so discusses the deleterious impact of one type of diversion (illegal marijuana grows) on anadromous fish, recognizing that merely dewatering a stream using irrigation pipes can be a diversion that harms such fish.  While the 2012 Legislature cannot speak with the voice of the 1961 Legislature, we find the following rule to be most apt:  " '[W]here the Legislature amends a statute without altering a consistent and long-standing judicial interpretation of its operative language, courts generally indulge in a presumption that the Legislature has ratified that interpretation.' "  (*People v. Anderson* (2002) 28 Cal.4th 767, 780.)[13]

---

[12]  The trial court found that the Legislature declared the coho salmon to be a threatened species in 2003, and an endangered species in 2005.

[13]  We need not discuss in any detail other, *later*-adopted statutes referenced by the parties or amici curiae.  These statutes, too, show the Legislature knows what divert means and how to limit its broad meaning when desired.  (See, e.g., Pen. Code, § 498, subd. (a)(5) ["change the intended course or path of electricity, gas, or water"]; Pub. Resources Code, § 5093.56 [referencing "the planning or construction of a dam, reservoir, diversion, or other water impoundment facility that could have an adverse effect on the free-flowing condition and natural character of" designated waters]; Wat. Code App. § 97-39, subd. (a); Stats. 1971, ch. 308, § 1, p. 636 [a person must notify a particular water agency if the person "intends to divert or cause to be diverted any surface water"].)

26

4. Legislative History

The trial court examined documents purportedly bearing on the legislative intent *behind* the words of the statute, both prior to the 1961 enactment, including the 1959 Senate Report referenced by both the 1973 Attorney General opinion and by the *Weaver* decision, and documents bearing on subsequent amendatory statutes.

Identifying and resolving statutory ambiguity are two separate interpretive steps. "[I]t is the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's 'legislative history.' " (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238; see *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1117-1118.) Even assuming statutory ambiguity has been identified, "[w]e rely on the legislative history of an ambiguous statute as dispositive only when that history is itself unambiguous." (*Medical Board v. Superior Court* (2003) 111 Cal.App.4th 163, 179; see *J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1578 ["courts can get it wrong when what they have before them is a motley collection of authors' statements, committee reports, internal memoranda and lobbyist letters. . . . In light of these factors, the wisest course is to rely on legislative history only when that history itself is unambiguous"].)

In this case, the 1959 Senate Report referred to proposals *that never passed*, and that explicitly referenced *mining* activities. True, that Senate Report discussed the same problem addressed by section 1602, but it at best dimly illuminates the meaning of that statute or any statute, for that matter, when its language was not on the table.

It is true, as the trial court found, that the Senate Report detailed the deleterious effects of aggregate mining and streambed alteration on anadromous fish.  We note that a separate statute passed in 1961 precluded using vacuum or suction dredge mining absent a permit, which the Department's predecessor would issue upon determining "that such operation will not be deleterious to fish."  (Former § 5653; Stats. 1961, ch. 1816, § 1, p. 3864; see now §§ 5653 et seq.)  There is no doubt that the lingering effects of California's mining history continued to affect fish, and that fact was well understood by the 1961 Legislature.[14]

But contrary to the trial court's view, the fact that gravel extraction deemed harmful to anadromous fish motivated the adoption of the relevant statutes does not import into the word divert any requirement that such diversion be linked to gravel extraction, or streambed alteration:  The Legislature properly could find the damage done by the Gold Rush required strong remedial measures extending to *all* forms of diversion.

The trial court found it significant that section 1602 does not refer to *use* of water, as did two sister-state statutes.  These statutes were described in a report by Ralph N. Kleps, then the Legislative Counsel, included within the Senate Report, with the opinion that California "could enact similar legislation."  According to his summary, an Alaska statute required notification for a "hydraulic project" or use of "any equipment that would use, divert, obstruct, pollute or change the natural flow or level of any river lake or stream" and Kleps stated the "Washington law is, in general, similar to the Alaska law."[15]  However, those statutes applied to equipment that would divert the natural flow

---

[14]  Further, that same year the Legislature declared a state policy "that preservation of fish and wildlife be provided for in connection with the construction of state water projects."  (Stats. 1961, ch. 867, §1, p. 2274; see Wat. Code, § 11900.)

[15]  See *State v. Crown Zellerbach Corp*. (1979) 92 Wash.2d 894, 896, footnote 1 [602 P.2d. 1172, 1173, footnote 1] (quoting a version of the relevant Washington law).

of any stream. A pump that removes water would fall within "any equipment" under such a statute. The fact *use* does not appear in the later-adopted California statute is of no moment. (See *Alameda*, *supra*, 213 Cal.App.4th at p. 1179 ["Nor does the fact that language *could be* clearer make it ambiguous"].)

In the trial court, the Farm Bureau argued the Legislature would not have intended to impact mere water extractions--without alterations of streambeds--pursuant to water rights without leaving some trace of such issue in the legislative record. (See, e.g., *In re Christian S.* (1994) 7 Cal.4th 768, 782 ["We are not persuaded the Legislature would have silently, or at best obscurely, decided so important and controversial a public policy matter"]; *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 589 ["The Legislature 'does not, one might say, hide elephants in mouseholes' "].) But the Legislature did not act silently on this subject: It acted by passing a statute using the word divert, which had a clear, preexisting meaning in the context of water law. That it did not explicitly address the then well-settled meaning of divert and the ensuing consequences of its actions creates no ambiguity in the word divert itself. (See *In re Christian S.*, at p. 782 ["The depth of the debate is the domain of the Legislature"].)

Thus the legislative documents considered by the trial court do not raise a latent ambiguity in section 1602.[16]

### 5. Administrative Interpretation

The Farm Bureau claims the Department has already *administratively* interpreted the provision in a manner favoring the Farm Bureau. We disagree.

We accept the Farm Bureau's general point that contemporaneous administrative interpretation of a statute is entitled to deference, but this deference arises (if at all) only

---

[16] We deny the Farm Bureau's request to take judicial notice of further legislative documents, both because they were not presented to the trial court (*People v. Preslie* (1977) 70 Cal.App.3d 486, 493) and because we find them unnecessary to consider.

29

when a statute is ambiguous, and is stronger where the agency has adopted a formal regulation interpreting a statute falling within its area of responsibility.  (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8.)  Although we find no linguistic ambiguity, and the Farm Bureau has not pointed to any *formal* regulatory interpretation, we briefly address the Farm Bureau's claims on this point.

First, the Farm Bureau points to a June 16, 1961, letter the Department sent, urging the Governor to sign the bill enacting section 1602.  Such executive department letters contained in enrolled bill reports are not probative of the intent of the *Legislature*, but under existing precedent must be deemed judicially noticeable.  (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 40-42.)  However, the Farm Bureau misinterprets the letter.  The quoted portion pertains to *government projects* that may "divert, obstruct or change the natural flow or bed of any stream," which refers to former section 1601, inapplicable herein.  The portion of the letter addressing former section 1602, applicable to private projects, merely states the bill requires, "Notification of department by private persons and opportunity for the department to make recommendations on stream work."  This is hardly a thoughtful administrative interpretation, it is a brief summary of the bill.  Moreover, the Legislative Analyst (whose views are both judicially noticeable and at times persuasive indications of the *Legislature's* views, see *Kaufman*, at p. 32) cogently summarized the bill on May 4, 1961, as covering "projects for diverting, obstructing *or otherwise changing the natural flow*" (italics added) of any river or stream, and emphasized that it was "basically a measure aimed at improving and preserving the spawning areas for salmon."  Change in the natural flow encompasses dewatering of spawning reaches, which jeopardizes the salmon's ability to spawn.

Second, the Farm Bureau points to a Biennial Report to the Governor from the Department covering the period July 1, 1960, through June 30, 1962.  This document gives a one-paragraph general description of the then-"new" statute, in which it is stated--

without analysis--that the notification requirement is applicable to "alteration of stream or lake beds." This report was designed to give an overview of the operations of the entire Department over a two-year period, and did not purport to give an authoritative interpretation of the new statute, merely a thumbnail sketch of it.

Third, the Farm Bureau points to the Department's view of the *2003 amendments* to the relevant sections, in an enrolled bill report. The document references "Streambed Alteration Agreements" a term added to the statute in the 2003 amendments, and references what it called "the current streambed statutes." (See Stats. 2003, ch. 736, § 2, p. 5523, adopting current § 1601, subd. (a) [" 'Agreement' means a lake or streambed alteration agreement"].) But the same document accurately states that the then-current version of the statute "requires any person to notify the Department before commencing any activity that will substantially divert or obstruct the natural flow *or* substantially change the bed, channel, or bank of any river, stream, or lake." (Italics added.) This shows the Department did not view the statute as applicable only to activities that alter the streambed itself, despite the use of the shorthand descriptor "streambed alteration agreement."

Finally, and more generally, the Farm Bureau asserts the Department has abruptly changed its policy regarding section 1602, by seeking to *enforce* it in a way it has never done before. This was the subject of conflicting evidence in the trial court. For purposes of this appeal, we construe that evidence in the light favorable to the trial court's ruling, which rejected the Department's evidence that it had tried to enforce the broad view of section 1602 before. But past non-enforcement does not necessarily reflect a formal administrative interpretation *precluding* enforcement, but could instead reflect the exercise of prosecutorial discretion or limited resources, as the Department argued in the trial court, in addition to arguing it *had exercised* discretion to enforce the statute broadly. One relevant executive report states the Department "*generally* uses these powers . . . where streambed alteration is involved, often with respect to very minor streams." (A.

31

Schneider, Legal Aspects of Instream Water Uses in California (Governor's Com. to Review Cal. Water Rights Law, Staff Paper No. 6, Jan. 1978), p. 98, italics added.)[17] This suggests that its powers are greater and it does not *always* use such powers only when streambed alteration has occurred.

More importantly, taking it as true--as the trial court found--that the Department has not previously enforced section 1602 absent streambed alteration, that is an insufficient basis on which to find the statute *precludes* it from doing so. In the face of extreme drought and piscatorial peril, the Department now wishes to employ the full measure of the law, to substantial dewatering of streams absent physical alteration to the streambeds. Its previous lack of enforcement does not rewrite the statute. (See *Bank of Italy v. Johnson* (1926) 200 Cal. 1, 15 [agency head "may not by the adoption of any rule of policy or procedure so circumscribe or curtail the exercise of his discretion under the statute as to prevent the free and untrammeled exercise thereof in every case, for an attempt to do so would be for him to arrogate to himself a legislative function"].) "Mere failure to act . . . does not constitute an administrative construction." (*Estate of Madison* (1945) 26 Cal.2d 453, 463; see *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1369 ["the mere failure to enforce the law, without more, will not estop the government from subsequently enforcing it"].)

In short, we see nothing in the Department's prior construction or enforcement of the statute that raises any latent ambiguity of meaning in the language of the statute. (See *Alameda*, *supra*, 213 Cal.App.4th at pp. 1188-1189.)[18]

---

[17] This was part of a series of reports drafted in response to the 1976-1977 drought, then viewed as "the worst recorded dry spell in California history." (M. Archibald, Appropriative Water Rights in California; Background and Issues (Governor's Com. To Review Cal. Water Rights Law, Staff Paper No. 1, May 1977), p. 1.)

[18] The trial court also found: "Under the plain meaning rule, the act of diverting water pursuant to a water right is within the scope of § 1602 if the diversion would substantially

6. Conclusion

Given the above discussion, interpreting the statute as posited by the Farm Bureau effectively reads the word divert out of the statute, contrary to the rule " 'that in attempting to ascertain the legislative intention effect should be given, whenever possible, to the statute as a whole and to every word and clause thereof, leaving no part or provision useless or deprived of meaning.' " (*Rank, supra,* 51 Cal.3d at p. 18.) The Farm Bureau's candidate of meaning does not *plausibly* account for the language of the statute, therefore no linguistic ambiguity has been demonstrated.

Thus, taking water out of its natural flow for agricultural purposes is a diversion of such water, whether or not the streambed itself is altered to accomplish the taking.

II

*Absurd Results and the Constitutional Doubt Doctrine*

The trial court posited that the Department's interpretation would lead to absurd results because, "Following [the Department's] argument and applying a literal interpretation, the preservation of fish and wildlife is the only factor to be considered in regulating [a] water right." The trial court separately expressed the view that the

---

adversely affect the fish and wildlife dependent upon the stream system. However, the definition would require that each diversion be examined on a case-by-case basis, something that was not contemplated in the 'Stopher criteria' of watershed-wide declaration advanced by the DFG. *Therefore the plain language interpretation does not completely address the issue of ambiguity.*" (Italics added.) This is not a correct conclusion. The fact that the aborted Stopher criteria may have *departed* from the need to determine on a case-by-case basis whether any given planned diversion was substantial does not raise any doubt about the constitutionality of the statute. Instead, it appears to reflect a misunderstanding of the statute by a Department employee. Further, the Department never applied the Stopher criteria, as the trial court found. The Department now concedes that a substantial diversion as used in section 1602 cannot equate to *any* diversion. Instead, as the 1973 Attorney General opinion concluded, what is a substantial diversion within the meaning of section 1602 depends on the facts of each case. (See 56 Ops.Cal.Atty.Gen., *supra*, at pp. 364-365.) This should have mooted any concerns about over-zealous enforcement.

33

Department's interpretation might impair vested property rights, and applied the rule that statutes should be construed so as to avoid constitutional doubts. (See *Long Valley*, *supra*, 25 Cal.3d at pp. 349-350.) These two different legal findings overlap to the extent they invoke water *rights* as a basis of decision, and both hinge on the existence of a statutory ambiguity, as we now explain.

A. *Constitutional Doubt*

The constitutional doubt canon applies if and only if the statute is "*realistically* susceptible of two interpretations and the interpretation to be rejected must raise *grave and doubtful* constitutional questions." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1146.) It "is a tool for choosing between *competing plausible interpretations of a statutory text*, resting on the reasonable presumption that Congress [or, *mutatis mutandis*, the Legislature] did not intend the alternative which raises serious constitutional doubts." (*Clark v. Martinez* (2005) 543 U.S. 371, 381 [160 L.Ed.2d 734, 747], italics added.)

Thus the trial court erred in even considering the canon, because there was no ambiguity to resolve. Further, applying section 1602 to agricultural users who *substantially* divert water--without altering the streambed--does not impair their vested water rights in any way. Section 1602 is merely a notification statute, triggering arbitration and adjudication procedures in the event of disagreement, *inter alia*, as to whether a substantial diversion has occurred or will occur. In rejecting a related claim we have held that "[t]he requirement . . . that Murrison notify [the Department] of his intent to substantially alter or divert Big Creek furthers the state's substantial interest in the protection of the state's fish and wildlife. This statutory requirement is inherent in the state's sovereign power to protect its wildlife and Murrison's water rights are subject to these powers. A water right, whether it predates or postdates 1914 is not exempt from reasonable regulation." (*People v. Murrison* (2002) 101 Cal.App.4th 349, 361; see *Rutherford*, *supra*, 188 Cal.App.3d at pp. 1276-1279 [rejecting claim that notification requirements are vague both facially and as applied]; see also *Howard v. County of San*

*Diego* (2010) 184 Cal.App.4th 1422, 1430 [administrative exhaustion case; " 'claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue' "].) We found Murrison's takings claim was unripe because the injunction and attendant civil penalties in that case merely enforced his duty to provide *notice* and did not of itself affect his *property rights*. (*Murrison*, at pp. 354, 362-363; see *Rutherford*, at p. 1280, fn. 4.) "The mere imposition of a notice requirement does not impact Murrison's ability to exercise his claimed water right. As a result, the provisions of the Fish and Game Code which *could* affect the amount to be diverted were never applied by [the Department]. Murrison's challenge to [the Department's] ability to restrict the amount of water he may take must wait until he notifies [the Department] of his intent to divert the stream *and* his water rights have been limited in some manner." (*Murrison*, at p. 362; see *id*. at p. 363 ["the arbitration panel provided for in the statute could have rejected [the Department's] requirements and imposed no restrictions . . . . Only if . . . restrictions are imposed may we determine whether a compensable taking has occurred"].)[19]

Thus, section 1602, which helps ensure the continued beneficial use of California's water; does not of itself effect a taking under the Fifth Amendment of the United States Constitution or under article I, section 19 of the California Constitution. (Cf. *B. C. Cotton, Inc. v. Voss* (1995) 33 Cal.App.4th 929, 949-950 [applying constitutional doubt canon where a contrary interpretation would raise a takings problem].) *If* a given diverter's usage is found to be substantial, requiring compliance

_____

[19] Amici curiae Pacific Legal Foundation and California Cattlemen's Association contend the notification process is burdensome to the point where it becomes a taking. This view is echoed by the Farm Bureau's brief responding to all amici curiae briefs. We find this argument, like Murrison's, is unripe.

with mitigation measures or halting such usage would not be a taking, but a proper exercise of regulatory police powers. (See *People ex rel. State Water Resources Control Bd. v. Forni* (1976) 54 Cal.App.3d 743, 753 (*Forni*); Walston, *The Public Trust Doctrine in the Water Rights Context: The Wrong Environmental Remedy* (1982) 22 Santa Clara L.Rev. 63, 85-92 [reallocation of use under public trust doctrine and reasonable use provision of the California Constitution does not result in a compensable taking].)[20]

B. *Absurd Results*

We have summarized the absurd result rule as follows: "[I]f a statute is susceptible to more than one interpretation, we must adopt the reasonable meaning and reject that which would lead to *an unjust and absurd result*." (*People v. Catelli* (1991) 223 Cal.App.3d 1434, 1448, italics added.) This exception "should be used most sparingly by the judiciary and only in extreme cases else we violate the separation of powers principle of government. (Cal. Const., art. III, § 3.) We do not sit as a 'super-legislature.' " (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1698.) "Each time the judiciary utilizes the 'absurd result' rule, a little piece is stripped from the written rule of law and confidence in legislative enactments is lessened. Retired Justice Macklin Fleming describes this as the '. . . devaluation of written law and of legislative authority of popular assemblies.' " (*Id*. at p. 1699.)

Again, we emphasize that because no ambiguity is presented by the statute, the absurd result rule cannot be used to rewrite it, even if the effects of its application are perceived as unfair--or even absurd--by some.

---

[20] In *Young v. State Water Resources Control Bd.* (2013) 219 Cal.App.4th 397, we upheld the Board's right to administratively adjudicate, subject to the judicial review, whether an unlawful diversion of water occurred, within the meaning of Water Code section 1831, regardless of whether the diverter claimed riparian or pre-1914 appropriative rights, although we acknowledged the Board lacked jurisdiction to *regulate* such rights. (*Young*, at pp. 400, 404-407.)

Quite obviously, a severe drought, which has the effect of further damaging the habitat of an endangered fish species, must be part of the factual matrix considered in determining what is a reasonable use of the water--water which belongs to the people, and only becomes the property of users--riparian or appropriative--after it is lawfully taken from the river or stream.  Past practices, no matter how long-standing, do not change current reality.  (See *Audubon*, *supra*, 33 Cal.3d at p. 447 [public trust doctrine case; "In exercising its sovereign power to allocate water resources in the public interest, the state is not confined by past allocation decisions which may be incorrect in light of current knowledge or inconsistent with current needs"]; *United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 142; see *id*. at p. 150 ["the Board unquestionably possessed legal authority under the public trust doctrine to exercise supervision over appropriators in order to protect fish and wildlife"] (*United States*).)

Contrary to the parade-of-horribles posited by the Farm Bureau and some allied amici curiae, and evidently assumed by the trial court, if a different policy is desired, the Legislature may rewrite the statute.  (See *Osborn v. Hertz Corp.*, *supra*, 205 Cal.App.3d at p. 711.)  In this connection we note that there is also no discussion--and *could not have been any discussion*--in the Senate Report of the consequences of the current drought on the viability of anadromous fish, *vis à vis* diversions of water.  As we indicated *ante*, " ' "that a statute can be applied in situations not expressly anticipated by [the Legislature] does not demonstrate *ambiguity*.  It demonstrates breadth." ' " (*Estate of Earley*, *supra*, 173 Cal.App.4th at p. 376, italics added.)  Balancing the needs of fish and agriculture is a matter well within the Legislature's competence, and if this *notification* statute is viewed by that body to be too onerous to farmers and ranchers, it can change the statute to balance water usage needs as it deems appropriate.

37

Thus, we see nothing absurd in applying the plain meaning of the statute.[21]

III

*Regulatory Overlap*

The trial court also concluded that applying what it conceded was the plain meaning of section 1602 would delegate to the Department the authority to adjudicate water rights that is now vested in the Board, and also allow the Department to prioritize beneficial uses of water contrary to the Board's powers. However, the Board, appearing in this court via amicus briefing, disavows any such conflict with the Department. Amici curiae Law Professors, too, support the Department's and Board's view that the two agencies act together, not in conflict, regarding issues over overlapping concern. We agree that applying the plain meaning of section 1602 does not blur the lines of authority between these agencies.

The Farm Bureau's point appears to be *not* that the Department *could not have been* given the power that the plain meaning of section 1602 confers as we have interpreted it, but rather that it *was not* given that power, and our interpretation of section 1602 would upset the division of power the Legislature has established between the Board and Department.

First, the Legislature is free to distribute power to state subdivisions, and if it chooses to take power from the Board and give it to the Department, it may. (See, e.g., *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6; *Mallon v. City of Long Beach* (1955) 44 Cal.2d 199, 209.)

---

[21] The Farm Bureau's claim that because the statute imposes criminal liability, it ought to be construed leniently fares no better. That interpretive rule, too, applies where and only where a statute is *first* found to be ambiguous, as a tie-breaker between candidates of meaning standing in relative equipoise inter sese. (See *People v. Cornett* (2012) 53 Cal.4th 1261, 1271; *People v. Manzo* (2012) 53 Cal.4th 880, 889.) Here, the interpretive candidates do not stand in relative equipoise, as we have explained at length, *ante*.

Second, as the Department and Board emphasize, they have always had the statutory authority and duty to work cooperatively on issues of common concern.

"The Department is obligated to protect the fish and wildlife resources of the state ([] §§ 1700, 5500 et seq.) which are the property of the people of the state ([] § 1600), who have 'the right to fish upon and from' the state's public lands and waters (state Const., art. I, § 25)." (*Fullerton v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, 593, fn. 1 (*Fullerton*).) "The Legislature has entrusted the supervision and protection of this valuable resource of the state to the [Department]." (*Ferrante v. Fish & Game Commission* (1946) 29 Cal.2d 365, 374 [referring to Department's predecessor].)

The Board is charged "with maximum flexibility to consider the competing demands of flows for piscatorial purposes and diversions for agricultural, domestic, municipal or other uses" when considering water appropriation claims, and the Board relies on the Department to advise it regarding matters within the Department's expertise, including fish. (*Fullerton*, *supra*, 90 Cal.App.3d at pp. 603-604.) The Board has the duty and expertise to administer water appropriations in the public interest, which includes all beneficial uses, including preserving and enhancing fish and wildlife resources. (See Wat. Code, §§ 1243 [fish and wildlife resources are a beneficial use], 1253 [Board shall allow appropriation of water "for beneficial purposes" that "in its judgment will best develop, conserve, and utilize in the public interest the water"], 13000 ["activities and factors which may affect the quality of the waters of the state shall be regulated to attain the highest water quality which is reasonable"], 13050, subd. (f) [beneficial water uses include "preservation and enhancement of fish"]; *United States*, *supra*, 182 Cal.App.3d at pp. 103, 109-110, 116, 126, 130; *Fullerton*, *supra*, 90 Cal.App.3d at pp. 603-604.) The Board may act against riparians, too, who unreasonably use water. (*United States*, *supra*, 182 Cal.App.3d at pp. 140-142; *Forni*, *supra*, 54 Cal.App.3d 743; see Wat. Code, § 275.)

It has " 'broad,' 'open-ended,' 'expansive' authority to undertake comprehensive planning and allocation of water resources." (*Audubon*, *supra*, 33 Cal.3d at p. 449.)

Water Code section 1243, which declares preservation of fish as a beneficial use of water when the Board considers requests for water appropriations, recognizes the overlapping expertise of the Board and the Department, partly providing: "The board shall notify the [Department] of any application for a permit to appropriate water. The [Department] shall recommend the amounts of water, if any, required for the preservation and enhancement of fish and wildlife resources and shall report its findings to the board."

The Board itself, appearing as an amicus on behalf of the Department, states: "The notification requirement Section 1602 establishes for substantial diversions does not conflict with the [Board's] administration of water rights. In fact, Section 1602 can assist the Board in carrying out its responsibilities to protect public trust resources where feasible. Whether a subsequent agreement reached pursuant to Section 1602 conflicts with water right laws or a decision of the [Board] is entirely hypothetical. Even then, limitations on the exercise of a water right are consistent with California law." Under the Board's view, the Department's actions in no way impair the Board's duty and power to adjudicate water rights issues. The Board emphasizes that inter-agency accommodations can be made, and any actual conflict could be resolved on an as-applied basis. We agree.

The trial court also concluded that applying the plain meaning would mean the Department "is guaranteed the appropriation of a minimum in-stream flow for the preservation of fish and wildlife, contrary to law" because such appropriation would bypass Board approval. The Farm Bureau defends the view that applying section 1602 to mere dewatering will in effect grant the Department power to compel minimum in-stream flows. We disagree with this view.

We have previously rejected a claim that a different statute which we construed to require a minimum in-stream flow to preserve fish would be unconstitutional. (See *California Trout*, *supra*, 207 Cal.App.3d at pp. 622-625.) It has also been held that the

40

Department cannot acquire an *appropriative right* to a minimum in-stream flow to preserve fish, for lack of a physical taking of the water, as required to perfect an appropriative right. (See *Fullerton*, *supra*, 90 Cal.App.3d at pp. 598-605.) These cases describe two different legal rules. Here, the Department seeks no *appropriative rights* but merely seeks to exercise the statutory mechanism for determining whether substantial diversions have occurred that may harm fish. This desire is consistent with the portion of *Fullerton* emphasizing the Department's role in informing the Board of piscatorial needs, before new appropriations are made. (*Fullerton*, *supra*, 90 Cal.App.3d at pp. 600-601.)

Accordingly, the Department's plain meaning interpretation of section 1602 does not intrude on the Board's powers or duties.

## CONCLUSION

A claim of statutory ambiguity must be resolved by a hierarchy of steps. Only if two candidates of meaning each plausibly account for the statutory language can it be said that a statute is ambiguous. Although extrinsic evidence may reveal a latent ambiguity, such ambiguity must reside in the language of the statute. Those of us tasked with statutory interpretation must be mindful of the presumption that the Legislature, as the Department concludes its briefing, "says what it means and means what it says." (*People v. Snook*, *supra*, 16 Cal 4th at p. 1215 ["We presume the legislature meant what it said"]; cf. Seuss, *Horton Hatches the Egg* (1940), *passim* ["I meant what I said[,] and I said what I meant"].)

41

## DISPOSITION

The judgment is reversed with directions to the trial court to enter judgment for the Department.  The Farm Bureau shall pay the Department's costs of this appeal.  (See Cal. Rules of Court, rule 8.278 (a)(2).)


                                                     DUARTE                , J.


We concur:


      ROBIE                , Acting P. J.


      MURRAY             , J.