[Civ. No. 31802.   Second Dist., Div. Five.   Oct. 4, 1968.]

JAMES TALCOTT, INC., Plaintiff and Appellant, v. ROBERT E. GEE, JR. et al., Defendants and Respondents.

Buchalter, Nemer, Fields & Savitch, Joseph Weissman and Stanley Imerman for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

STEPHENS, J.—This is an appeal from a judgment in favor of defendants and award of costs to defendants in an action for a deficiency under an equipment lease agreement.

The facts are that on June 15, 1964 Credit Mobilier, a California corporation, and Robert E. Gee, Jr., doing business as Crawford Ink & Supply Co. (hereinafter referred to as Gee) entered into a written lease agreement for the lease to Gee of a certain printing press. The term of said lease was 5 years and the total rental was $19,740, payable in 60 monthly instalments of $329. As security for full payment of rent and performance of the provisions of the lease, a deposit of $1,944 was paid to Credit Mobilier. On June 27, 1964, by an instrument in writing, Credit Mobilier assigned all of its rights to the lease and the printing press to James Talcott Western, Inc., predecessor of the present plaintiff, James Talcott, Inc. (hereinafter referred to as Talcott).

Gee leased the printing press for use in his business, and began making monthly payments on the lease beginning with the July 15, 1964, instalment. After July 21, 1965, Gee stopped making payments. There was testimony indicating that thereafter Gee had offered to pay off the lease provided that Talcott would credit Gee with the original security deposit. Talcott refused to credit Gee for his security deposit, but did quote Gee a payoff figure of $13,807.20. There is no evidence to indicate whether Gee ever attempted to pay Talcott this sum or any other sum.

On October 8, 1965, Talcott filed its complaint to recover possession of the press and for the balance of rents due under the lease. Talcott repossessed said printing press on the above date, and on June 3, 1966, sold the same at public auction.

On the basis of the above facts, the trial court concluded that the purported lease agreement was in fact a conditional sales contract; that Gee made a valid tender of the balance due under such contract, thereby vesting title in Gee; that the subsequent repossession sale of the printing press by Talcott was a conversion thereof; and that, in any event, no deficiency

judgment was recoverable because of the provisions of Civil Code section 1812.5.

## The Unruh Act Question

The crucial question which we are asked to decide on this appeal is whether Civil Code section 1812.5,[1] the anti-deficiency provision of the Unruh Act (Civ. Code sections 1801 et seq.), applies to credit sales to businessmen for commercial purposes, or whether that section is limited to credit sales to consumers for noncommercial purposes. We have concluded that the code section in question applies solely to conditional sales of consumer goods, and does not embrace commercial transactions.

The transaction in the present case was of a commercial nature, involving the lease and/or sale of business equipment for business purposes. Civil Code section 1802 states that the definitions given in the ensuing sections are to govern the construction of the act. The first such definition is found in section 1802.1, which defines goods as "tangible chattels bought for use primarily for personal, family or household purposes. . . ." The trial court, in construing such language, held that since the equipment was for the lessee's personal use in his business, the transaction fell within the terms of the act. Such a construction does not seem tenable in our opinion. Even a corporation when it buys or leases equipment can be said to have done so for its own personal use in its business. That is a semantical equivocation which in no way changes the primary character of use from that of business to personal. The lease or sale to a business entity to be used in such business is a use for commercial purposes, and not a use for personal purposes within the meaning of the Unruh Act.

In a footnote to his opinion in *Elster's Sales v. El Bodrero Hotel, Inc.*, 250 Cal.App.2d 258, 260 [58 Cal.Rptr. 492], Justice Fleming made the following observations: "At the time of the contract deficiency judgments were permitted for all types of conditional sales. Since 1963 deficiency judgments on conditional sales of consumer goods have been prohibited by Civ. Code, § 1812.5, but a repossessor must still account to the buyer for any surplus derived from the proceeds of the resale. (Civ. Code, § 1812.4.) These provisions of the Civil Code are limited to retail installment contracts covering tangible chat-

---

[1]Civil Code section 1812.5: "If the proceeds of the sale are not sufficient to cover items (1), (2) and (3) of Section 1812.4, the holder may not recover the deficiency from the buyer or from anyone who has succeeded to the obligations of the buyer."

tels bought primarily for personal, family, or household purposes (Civ. Code, §§ 1802.6, 1802.5, 1802.1), a classification which obviously would not include restaurant equipment. Business equipment is still subject to the general provisions of the Commercial Code, which continue to permit deficiency judgments after repossession and resale. (Com. Code, § 9504.)''

■ There is no question but that the Unruh Act was designed to protect the consumer from abusive credit practices. Such protection, however, was not deemed to be necessary where equally competent businessmen are dealing with each other in arm's length transactions. A perusal of the Commercial Code sections as contrasted with comparable sections of the Unruh Act clearly evidences this intent on the part of the Legislature.[2] Thus, Civil Code section 1804.1[3] prohibits a seller from exacting a contractual waiver of defenses from a buyer, whereas Commercial Code section 9206 permits a seller to do so, and the amended official comment to such section makes it clear that ''such clauses . . . are validated outside the *consumer* field'' and that ''the validation of waivers . . . is expressly made 'subject to any *statute* or decision' which may restrict the waiver's effectiveness in the case of a buyer of *consumer* goods.'' (Italics ours.) In short, the Commercial Code is replete with evidence that the Legislature intended consumer transactions to be governed by different principles than those which govern transactions among businessmen. For example, the official comment to section 9101 provides, in part: ''Consumer installment sales and consumer loans present special problems of a nature which make special regulation of them inappropriate in a general commercial codification.'' And section 9109, in classifying goods, provides: ''Goods are (1) 'consumer goods' if they are used or bought for use primarily for personal, family or household purposes; (2) 'equipment' if they are used or bought for use primarily in business. . . .'' It is not without

---

[2]The transaction here involved is not governed by the Uniform Commercial Code (§§ 10101, 10102). While that code had been introduced and passed in the 1963 regular session of the Legislature and approved by the Governor on June 8, 1963, its effective date is January 1, 1965. The right to a deficiency judgment as of the time of the contract in question is determined under Civil Code section 1780. (See *McMillen* v. *Pippin*, 211 Cal.App.2d 674, 676 [27 Cal.Rptr. 590].)

[3]The original Unruh Act, commencing at Civil Code section 1801, became effective on January 1, 1961, and the amendment to section 1812.5 prohibiting deficiency judgments in matters governed by that act was added by statute in 1963.

significance that the definition of goods in the Unruh Act parallels the definition of consumer goods in the Commercial Code.

▇ Thus, there is a real distinction between goods purchased for personal use and goods purchased for business use. The two are mutually exclusive, and the principal use to which the property is put should be considered as determinative. Accordingly, we hold that goods purchased, as in the present case, for business use, are governed by the provisions of the Commercial Code, and not those of the Unruh Act, and a deficiency judgment, while not permitted by the latter, is authorized under the Uniform Commercial Code (§ 9504).

### The Effect of the Finding of Tender

▇ As a general rule, a premature offer of performance is not a valid tender, and a buyer under an instalment contract calling for payments at specified intervals cannot put his seller in default by tendering the unpaid balance, since the seller is not required to accept such payment prematurely. However, the parties may provide in their contract for a right of prepayment. (*Record etc. Co.* v. *Pageman Holding Corp.*, 42 Cal.2d 227, 232 [266 P.2d 1] ; *Smith* v. *Hill*, 237 Cal.App. 2d 374, 394-395 [47 Cal.Rptr. 49] ; *Warshauer* v. *Bauer Constr. Co.*, 179 Cal.App.2d 44, 50 [3 Cal.Rptr. 570].)

▇ Under the Unruh Act, however, a buyer has an absolute right to prepayment. (Civ. Code, § 1806.3.) In the present case, the trial court, applying the Unruh Act to the transaction in question, evidently assumed that a right of prepayment existed and accordingly, found that a valid tender had been made. Since we have concluded that the Unruh Act does not apply, on remand it will be necessary for the court to first determine from the four corners of the instruments involved whether prepayment was contemplated, and second, if such a right is found to exist, whether in fact there has been a valid tender.

The judgment is reversed.

Kaus, P. J., and Aiso, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.