[Civ. No. 15310. Fourth Dist., Div. Two. May 14, 1976.]

CESSNA FINANCE CORPORATION, Plaintiff and Appellant, v.
BEN D. PIVO et al., Defendants and Respondents.

COUNSEL

Collins, Gregory & Rutter, Rutter & Ebbert and Marshall A. Rutter for Plaintiff and Appellant.

Barry J. Glanell for Defendants and Respondents.

OPINION

McDANIEL, J.—

## INTRODUCTION

The action in the trial court was for recovery of a deficiency judgment by the seller's assignee against the buyers of three small aircraft after repossession and sale. Judgment was awarded the defaulting buyers on the theory that the transaction came under the Unruh Act which precludes deficiency judgments where the goods have been purchased for personal, family or household purposes. The material facts are not disputed. In our view, there was misapplication of the law to the facts as found in that the trial court concluded that the aircraft had been purchased for the kind of use which invokes the protection of the Unruh Act. We see it clearly that the three aircraft were not purchased primarily for this kind of use, and hence that the buyers were not insulated from a deficiency recovery. Accordingly, the judgment must be reversed.

## FACTS

As noted, there was little, if any, dispute between the parties about the details of the transaction itself; the focus of the controversy was on how what did happen should be characterized legally. Turning to the transaction, then, in October of 1969, the three named defendants, brothers and practicing pharmacists, with no money down purchased three Cessna 150 aircraft from a Cessna dealer doing business as American Aircraft Leasing, Inc. Each brother was a party to each of three written "Security Agreement—Conditional Sales Contracts," each contract covering one of the three aircraft.

These sales were an outgrowth of conversations and the written exchange of information between the defendants, on the one hand, and two other persons on the other. One of these others was Clifton O. Walters, president of American Aircraft Leasing, Inc. The other was Martin Sorkin, a certified public accountant. The deal appeared to develop as follows: Walters pointed out to the defendants that new Cessna aircraft could be purchased with no money down. Next he pointed out, should the defendants decide to buy, that they could lease the aircraft to a flying club known as Aviation Unlimited. Aviation Unlimited would in turn rent out the aircraft to its members. If the volume of such rentals could be anticipated as projected by Sorkin, also employed by Aviation Unlimited, the result would be that the revenue from the leases would be sufficient to make the monthly payments on the three conditional sales contracts. Sorkin's written presentation to defendants also pointed out how they could gain certain income tax advantages by claiming depreciation of the aircraft. The pitch apparently was convincing, for the aircraft were purchased as noted.

The same day the contracts were entered into they were assigned by the seller to plaintiff Cessna Finance Corporation. About a week later, the defendants leased the aircraft to Aviation Unlimited for a period of two years on the basis of $8.50 per hour for each hour that the club rented out the aircraft to its members, prospective members, and employees. Under the terms of the lease, Aviation Unlimited would make the installment payments directly to plaintiff. It also would arrange for insurance and maintain the aircraft. Such expenses were all to be charged against the accrual of the hourly rentals. Under the whole arrangement the defendants, if all went well, would end up owning the three aircraft while never having had to put up any of their own money.

However, all did not go well. Payment of the installments continued as agreed only until and including November 1970. None were made after that. Each of the three conditional sales contracts had the usual provisions setting forth the remedies available to the seller in the event of default. Under these provisions, the aircraft were repossessed and eventually sold by plaintiff. No contention has been made by defendants concerning the adequacy of the notice of sale or the manner in which the sale was conducted, and so we infer that the sale of the aircraft by plaintiff as the repossessing assignee of the seller was made in a commercially reasonable manner. The findings in this respect readily support such an inference.

After sale of the three aircraft and crediting of the sales proceeds, the respective balances still due on the three conditional sales contracts were $6,169.56, $6,203.92 and $5,903.91. It was to recover these amounts in the aggregate plus interest, attorneys fees and costs that suit was filed.

Otherwise, the findings paraphrased, included the following significant items. At the time of their repossession, the aircraft had been flown 591.93, 837.2 and 902.72 hours respectively. At all times material, the defendant Ben D. Pivo was a licensed pilot. During the interval between the lease to Aviation Unlimited and repossession he flew one or more of the aircraft "a total of not to exceed 100 hours." The defendant Jack Pivo received 16.5 hours of flying lessons in one or more of the aircraft. The defendant Robert Pivo never took any flying lessons and rode as a passenger in one or more of the aircraft "a total of not to exceed 100 hours."

Among the conclusions of law were statements that the repossession was not violative of any law, or Constitution of the State of California, or of the United States of America, that the three aircraft were sold in a commercially reasonable manner, that the three written contracts were not invalid by reason of being contracts of adhesion, that the three aircraft fell within the definition of "goods" as contained in section 1802.1 of the Civil Code,[1] that the defendants were retail buyers as defined in section 1802.4 of the Civil Code,[2] and that American Aircraft Leasing, Inc. was a retail seller as defined in section 1802.3 of the Civil Code.[3]

On the basis of the findings and the conclusions of law noted, the trial court decided that the plaintiff was not entitled to a deficiency judgment

---

[1]Section 1802.1 of the Civil Code reads: " 'Goods' means tangible chattels bought for use primarily for personal, family or household purposes, including certificates or coupons exchangeable for such goods, and including goods which, at the time of the sale or subsequently are to be so affixed to real property as to become a part of such real property whether or not severable therefrom, but does not include any vehicle required to be registered under the Vehicle Code, nor any goods sold with such a vehicle if sold under a contract governed by Section 2982 of the Civil Code."

[2]Section 1802.4 of the Civil Code reads: " 'Retail buyer' or 'buyer' means a person who buys goods or obtains services from a retail seller in a retail installment sale and not principally for the purpose of resale."

[3]Section 1802.3 of the Civil Code reads: " 'Retail seller' or 'seller' means a person engaged in the business of selling goods or furnishing services to retail buyers."

by reason of section 1812.5 of the Civil Code.[4] Judgment was entered accordingly for the defendants and they were awarded $5,000 attorneys fees plus costs. From this judgment the plaintiff appealed.

## ISSUES, DISCUSSION AND DISPOSITION

■ Plaintiff-appellant Cessna Finance Corporation states the principal issue to be whether the three aircraft purchased by the defendants were "goods . . . for use primarily for personal, family or household purposes" so as to bring the defendants under the protection of the anti-deficiency judgment provisions of the Unruh Act. Secondarily, plaintiff complains of error in the trial court's refusal to allow discovery of the defendants' income tax returns.

The defendants concur that the principal issue is whether they are entitled to the protection of the Unruh Act with respect to its anti-deficiency judgment provisions. However, in their treatment of this issue, they have introduced a refinement involving the choice of test which the courts should make in aid of resolving the main issue. More particularly, should the "intent" at the time the contract was entered into be controlling in answering the question of what use the goods were bought for, or should the actual use as demonstrated over the life of the contract be determinative?

The defendants' position is that the intent at the time of retail sale should control, and here, because they see substantial evidence to support findings of intent primarily for personal use, that the judgment in their favor was proper. Assuming their choice of the proper test is correct, the evidence in the record does not support defendants' analysis. As we analyze the record, regardless of which test is applied, the result is the same; these three aircraft were not bought primarily for *personal* use by the defendants in terms of the objectives and concerns of the Unruh Act.

---

[4]Section 1812.5 of the Civil Code reads: "If the proceeds of the sale are not sufficient to cover items (1), (2) and (3) of Section 1812.4, the holder may not recover the deficiency from the buyer or from anyone who has succeeded to the obligations of the buyer."

Section 1812.4 of the Civil Code provides: "The proceeds of a resale shall be applied (1) to the payment of the expenses thereof, (2) to the payment of any expenses of retaking, including reasonable attorney's fees actually incurred, and of any expenses of keeping, storing, repairing, reconditioning or preparing the goods for sale to which the holder may be entitled, (3) to the satisfaction of the balance due under the contract. Any sum remaining after the satisfaction of such claims shall be paid to the buyer."

Otherwise, plaintiff rightly observes that there is a dearth of authority to guide us in deciding whether the Unruh Act should or should not apply to a given transaction. However, plaintiff cites *James Talcott, Inc.* v. *Gee,* 266 Cal.App.2d 384 [72 Cal.Rptr. 168], as suggesting the route to follow. That case involved the sale of a printing press, but certain language of the opinion we find particularly persuasive in dealing with the case at bench. At page 387, Justice Stephens observes: "There is no question but that the Unruh Act was designed to protect the consumer from abusive credit practices. Such protection, however, was not deemed to be necessary where equally competent businessmen are dealing with each other in arm's length transactions. A perusal of the Commercial Code sections as contrasted with comparable sections of the Unruh Act clearly evidences this intent on the part of the Legislature . . . In short, the Commercial Code is replete with evidence that the Legislature intended consumer transactions to be governed by different principles than those which govern transactions among businessmen."

On the facts of the case here, it would be difficult indeed to characterize the defendants, to use certain language of plaintiff's brief, as "simple, unsophisticated consumers being hustled into [buying] an overpriced washing machine or broken down used car." We agree with the plaintiff's observation that "They did not need or deserve the protection of a consumer protection act such as the Unruh Act." The defendants are successful businessmen who had investments in commercial real estate in addition to their pharmacy business.

Turning to the actual task of legal evaluation of whether the Unruh Act should here be applied, there seems little doubt, on the basis of the evidence, that the use of the aircraft was not intended at the outset to be *personal.* ■ At this point, we note our agreement with defendants on when the intent of the parties should be determined in deciding the larger question of whether a given transaction should come under protection of the Unruh Act. We suggest that California should follow the Washington decision in *Commercial Credit Equipment Corporation* v. *Carter,* 83 Wn.2d 136 [516 P.2d 767], and look to the intent of the parties at the time the contract is entered into. We are persuaded by the reasoning of the *Carter* court for its choice as reflected by the following language: "It is inconsistent with . . . [the] policy [to simplify, clarify and modernize the law governing commercial transactions] to require a creditor to monitor use of the collateral in order to ascertain its proper classification. The uncertainty caused by the potentially shifting status of the goods is not desirable in the commercial world. Also, there exists a

potential mischief by debtors facing default who might endeavor to convert goods from the category of equipment to consumer goods to avoid a deficiency and, likewise, by creditors making the opposite claim in order to benefit from a deficiency . . . [¶] We therefore agree with the court in *Franklin Inv. Co.* v. *Homburg,* 252 A.2d 95, 97 (D.C.C.A.1969) that: For our purposes, the manner in which a product is classified is determined at the time of agreement between the parties giving rise to the security interest, and, as to them, the categorization remains unaffected by a later transfer of the product in question." (516 P.2d at pp. 769-770.) ▆▆ If the *Carter* test is applied here, the result weighs in favor of the plaintiff. The evidence of intent of the parties at the time of purchase was that no use primarily for personal, family, or household purposes was contemplated.

Specifically, it was intended from the beginning that the aircraft, after purchase, would be leased to Aviation Unlimited for the purpose of generating revenue to make the monthly payments. Such a plan necessarily contemplated that the primary use of the aircraft would be by persons other than the buyers. If it were otherwise, i.e., that the defendants were going to make the primary use of the aircraft, then what would have been the point of the leases to Aviation Unlimited?

Turning to the larger question noted, it appears to us that where the trial court erred was in undertaking to differentiate various kinds of business use and to see the kind here involved as protected by the Unruh Act because "As I see it, that isn't the typical use that the businessman makes when he makes an investment." We think the decision on whether the Unruh Act applies should involve instead an inquiry into whether the use is primarily personal. Looking again to the *Talcott* language as a guide, we see "personal, family, or household use" to mean just that. (*James Talcott, Inc.* v. *Gee, supra,* 266 Cal.App.2d 384, 386-388.) The protection of the Unruh Act is a stringent encroachment on the freedom of the market place albeit its laudable motives in diminishing the practice of fraud upon nonbusinessmen, consumer types. If this observation is valid, then there is no reason to extend the concept of "personal, family or household use" beyond its literal, everyday common usage meaning.

Corroborating the intent that was apparent at the outset, the defendants actually made very little personal use of these three aircraft according to the trial court's findings. Together the three were flown a

total of 2,331.85 hours. One defendant flew them "not to exceed 100 hours," another defendant took 16.5 hours of flying lessons, and the third defendant rode in them "not to exceed 100 hours." By any definition, this is hardly *personal* use. Whether the use intended was a so-called "typical" business use we believe to be immaterial. Again, we see the key inquiry to be whether a personal, family, or household use was intended.

Because of the disposition of the main issue on appeal, it is not necessary to consider the plaintiff's claim of error in the form of the trial court's refusal to allow discovery of the defendants' income tax returns. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 223, p. 4212.)

Because the findings are sufficiently complete on all factual issues, there is no need for another trial. Accordingly, in reversing the judgment, which we do, we also direct the trial court to enter judgment in favor of plaintiff in the principal sum of $18,277.39 plus interest at the legal rate from the date of sale of the collateral, plus attorneys fees of $7,560, per the findings of the trial court, together with costs as taxed in the trial court. Since the judgment was entered, plaintiff has been put to further expense to vindicate its claim by means of this appeal. Therefore, a further allowance of fees should be made. (*American City Bank* v. *Zetlen,* 272 Cal.App.2d 65, 67 [76 Cal.Rptr. 898].) In our view, the trial court is better equipped to take evidence on the value of the services of plaintiff's counsel in handling the appeal. The trial court is directed to do so upon proper application by plaintiff and to make an appropriate order accordingly. Plaintiff under this order shall also recover its costs on appeal.

The judgment is reversed with directions as noted.

Tamura, Acting P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied June 8, 1976, and respondents' petition for a hearing by the Supreme Court was denied July 8, 1976.