Filed 9/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DAVIS BOAT MANUFACTURING-NORDIC, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> WELDON SMITH, JR., <br><br> Defendant and Respondent. | F083253 <br><br> (Super. Ct. No. 9000168) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County. John Mayne, Judge.

Nemecek & Cole, Frank W. Nemecek, Claudia L. Stone and Marshall R. Cole for Plaintiff and Appellant.

Weldon Smith, Jr., in pro. per., for Defendant and Respondent.

-ooOoo-

Plaintiff and appellant Davis Boat Manufacturing-Nordic, Inc. (Davis Boat), which prevailed in a breach-of-contract action against defendant and respondent Weldon Smith, Jr., applied for an order to sell Smith's home. The Stanislaus County Superior Court denied the application on the basis of Code of Civil Procedure[1] section 699.730, a recently added statute that prohibits the forced sale of a judgment debtor's principal place of residence to satisfy a "consumer debt" except under certain circumstances.

Rejecting Davis Boat's assertions on appeal, we hold that the definition of "consumer debt" in section 669.730 is not latently ambiguous and that section 669.730 neither violates the contract nor the equal protection clauses of the federal and state Constitutions. We affirm the postjudgment order.

## FACTUAL AND PROCEDURAL HISTORY

On September 14, 2012, Smith signed a "**Conditional Sale Agreement**" to purchase a "2011 Nordic 42 Inferno" boat and trailer from Davis Boat for $126,562.50. The "**Payment Terms**" specified: (1) the $126,562.50 sum would be paid in 12 monthly installments of $10,546.87 beginning October 15, 2012; (2) the final installment payment would be due on or before October 15, 2013; and (3) a $30,000 "Balance of Down Payment" was "still due." The "**Terms and Conditions**" further specified: (1) Smith "hereby grants to [Davis Boat] a security interest in the [boat and trailer] to secure payment of the purchase price and performance of all obligations under this Agreement"; and (2) in the event of a default, Davis Boat "may" "[d]eclare the entire unpaid balance of payments for the unexpired term of the Agreement immediately due and payable," "[c]harge [Smith] interest on all monies due [Davis Boat] from and after the date the same is due at the rate of twelve percent (12%) per annum, calculated monthly, until paid," "[r]equire [Smith] to return the [boat and trailer] at [his] expense," and "[f]ile suit

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Code of Civil Procedure.

to collect any amounts due to [Davis Boat]." The boat and trailer were delivered to Smith at the time this agreement was signed.

In a complaint filed September 12, 2016, Davis Boat sued Smith for breach of contract. The company alleged Smith "fail[ed] to pay . . . the entire balance outstanding under the Agreement by October 15, 2013" and "shirked his payment obligations by only paying approximately $39,500.00 of the $156,562.50, leaving an unpaid balance of approximately $117,062.50, together with accrued interest . . . ." Ultimately, Davis Boat sought $189,900 in damages.

On June 2, 2017, the superior court filed an order granting Davis Boat's application for a temporary restraining order, which restrained Smith from "[t]ransferring any interest by sale, pledge, or grant of security interest, or otherwise disposing of, or encumbering," "[c]oncealing or otherwise removing . . . in such a manner as to make it less available to seizure by the levying officer," and "[i]mpairing the value of" the boat and trailer. On July 18, 2017, the court filed an order granting Davis Boat's application for a preliminary injunction, which likewise restrained Smith from "(a) transferring any interest by sale, pledge, or grant or security interest or otherwise disposing of, or encumbering; (b) concealing or hiding; and (c) impairing the value of" the boat and trailer.

A jury trial commenced December 11, 2019. On December 17, 2019, the jury returned a unanimous verdict in favor of Davis Boat and against Smith in the amount of $189,900. Davis Boat was also awarded $12,024 in costs and $188,286 in attorney's fees. Judgment was entered February 14, 2020. Smith appealed.

On August 13, 2020, the superior court issued a "**TURNOVER ORDER IN AID OF EXECUTION OF JUDGMENT**," directing Smith to transfer to the Stanislaus County Sheriff's Office the boat, trailer, and documentary evidence of title thereto. In an "**ORDER FINDING DEFENDANT WELDON SMITH JR. IN CONTEMPT**" filed December 7, 2020, the court determined Smith "willfully violated the [July 2017]

3.

Preliminary Injunction by concealing and hiding" the boat and trailer. On December 10, 2020, Davis Boat filed a motion to dismiss Smith's appeal pursuant to the disentitlement doctrine. In an order filed December 30, 2020, we granted this motion in view of the contempt order, among other things. Remittitur issued March 1, 2021. The superior court subsequently awarded Davis Boat $1,770.60 in costs on appeal and $32,763.50 in appellate attorney's fees.

Meanwhile, the Legislature enacted Assembly Bill No. 2463 (2019-2020 Reg. Sess.) (Assembly Bill No. 2463), which added section 699.730. (Stats. 2020, ch. 218, § 1.) This provision took effect January 1, 2021. (See Cal. Const., art. IV, § 8, subd. (c)(1).)

On or around June 18, 2021, the Stanislaus County Sheriff's Office performed a levy on Smith's home. On June 24, 2021, Davis Boat filed an "**APPLICATION FOR ISSUANCE OF ORDER FOR SALE OF DWELLING**." On June 28, 2021, the superior court filed an "**ORDER TO SHOW CAUSE WHY ORDER FOR SALE OF DWELLING SHOULD NOT BE MADE**." In his "OPPOSITION IN RESPONSE TO ORDER TO SHOW CAUSE," Smith contended the transaction for the boat and trailer concerned a "consumer debt," i.e., a " 'debt incurred by an individual for personal, family or household purposes,' " and section 699.730 "precluded the sale of a primary residence to satisfy a judgment lien" based on such debt.

In its reply, Davis Boat countered section 699.730 was inapplicable because "the judgment is not on a consumer debt." (Boldface, underlining & capitalization omitted.) The company pointed out section 699.730 and the federal Bankruptcy Code (11 U.S.C. § 101 et seq.) both defined "consumer debt" as debt incurred by an individual primarily for a personal, family, or household purpose. Davis Boat then cited federal bankruptcy cases for the proposition "consumer debt should be [narrowly] interpreted as meaning goods and services necessary to daily life – food, shelter, clothing, medicine, medical care and such." The company also relied on the "ASSEMBLY COMMITTEE ON

4.

JUDICIARY" and "SENATE JUDICIARY COMMITTEE" reports on Assembly Bill No. 2463 to support its position:

"If the . . . § 699.730(a) definition of consumer debt is construed to be applicable to the boat, then everything a judgment debtor acquires for his own use, his family's use or for the home, is a consumer debt – a Rolex watch, a diamond necklace, a classic car, a motorhome, an airplane, and so on and so forth.  Clearly, the Legislature could not have intended such an absurd result.  Indeed, the California Assembly Judiciary Committee's analysis of the statute (as AB 2463) identifies the following as the key policy concern underlying the bill:  'SHOULD THE HOMES OF DEBTORS BE PROTECTED FROM BEING AUCTIONED OFF IN ORDER TO SATISFY UNSECURED CONSUMER DEBTS WHICH OFTEN AMOUNT TO A FEW THOUSAND DOLLARS?'  [Citation.]  The analysis' synopsis states that the bill 'would end the ability of creditors to use unsecured consumer debts, *such as credit card, medical and student loan debt*, as devices to force the sale of debtors' homes.  [Citation.]  The 'Comments' in the analysis state that the bill serves to protect judgment creditors [*sic*] from losing their homes during the current housing crisis and COVID-19 pandemic.  [Citation.]  The stated 'Justification' for the bill provides, that it serves to protect low-income communities from homelessness over small consumer debts of a few thousand dollars.  [Citation.]  The Senate Judiciary Committee Analysis reflects the same considerations.  [Citation.]  The bill seeks to prevent creditors from taking homes based on consumer debt judgment obligations because the practice 'prolongs poverty in communities of color, and it takes wealth from poor people and gives it to corporations and the wealthy.'  [Citation.][2]  Clearly, applying Section 699.730 to protect a judgment debtor from collection of a judgment stemming from his purchase of a . . . high-performance race boat is not what the Legislature contemplated when it passed AB 2463 as a means of protecting low-income families from the poverty cycle by preventing corporations from stripping them of their primary asset over

---

[2] In a footnote, the Senate Judiciary Committee mentioned:

"The version of the bill analyzed by the Assembly Judiciary Committee (Version 97) limited the ban on forced home sales to 'unsecured consumer debts.'  This language created a loophole that would have allowed forced home sales for debt secured by property *other* than the home, no matter how small the debt.  The current version therefore clarifies that only consumer debts *secured by the home* can be collected on via a forced home sale (unless they fall into one of the other exemptions)."

small debts.  The Legislature was concerned with protecting vulnerable low income families from homelessness induced by creditors selling their homes to satisfy debts over student loans, washing machines, refrigerators, and the like.  [Citation.]"

In a tentative ruling, the superior court denied Davis Boat's application.  It reasoned:

"Davis Boat cites two primary reasons that [section 699.730, subdivision (a)] should not apply:

> "1. The purchase of the boat is not consumer debt based on the federal standard; and

> "2. The purchase of the boat is not consumer debt based on the intent of the authors of the bill.

". . . .  [T]he boat was plainly a high-end item not designed as, say, a commuter vehicle.

"Davis Boat cites *In re Carolan* (1996) 204 B.R. 980 (9th Cir., Bankruptcy Appeal) for the proposition that a stereo and microwave might be luxury purchases and therefore exempt from very similar language in 11 U.S.C.A. section 101.  Davis Boat has erred here.  While indeed 11 U.S.C.A. section 101(8) defines consumer debt identically, *Carolan*'s discussion of what is or is not a luxury item is based on 11 U.S.C.A. section 523(a)(2)(C)(i)(I) which outlines the rules on recently acquired 'luxury goods.'  In fact the excision of 'luxury goods' under limited circumstances indicates that under other circumstances such goods would be subject to the definition.

"Davis Boat argues further that the intent of the lawmakers is clear – this is an effort to help the working poor, not wealthy boat converters who have actively avoided legitimate collection efforts.  Davis Boat says the boat was not for 'personal family' use, but that is not what the section says:  It's for 'personal, family, or household purposes.'  Those purposes are not limited in the way Davis Boat proposes.

"There is no evidence it was purchased for commercial purposes, which would be exempt from this consumer debt clause.

"Use of legislative history is appropriate when the language is not clear; the rule is that it can be used when 'the statutory language permits more than one reasonable interpretation.'  But when the language is clear, legislative history is irrelevant.  This was a personal purchase – not to maintain a basic

6.

need, but rather an extraordinary luxury good not available to most people. The fact that the code section covers an item far outside of the stated intent is a legislative issue and not one this Court can remedy."[3]

## DISCUSSION

**I.     Statutory language**

Section 699.730 provides:

"(a) Notwithstanding any other law, the principal place of residence of a judgment debtor is not subject to sale under execution of a judgment lien based on a consumer debt unless the debt was secured by the debtor's principal place of residence at the time it was incurred. As used in this subdivision, 'consumer debt' means debt incurred by an individual primarily for personal, family, or household purposes.

"(b) Subdivision (a) does not apply to any of the following types of unpaid debts:

"(1) Wages or employment benefits.

"(2) Taxes.

"(3) Child support.

"(4) Spousal support.

"(5) Fines and fees owed to governmental units.

"(6) Tort judgments.

"(7) (A) Debts, other than student loan debt, owed to a financial institution at the time of execution on the judgment lien, if both of the following requirements are met:

"(i) The amount of the original judgment on which the lien is based, when entered, was greater than seventy-five thousand dollars ($75,000), as adjusted pursuant to Section 703.150.

"(ii) The amount owed on the outstanding judgment at the time of execution on the judgment lien is greater than

---

[3] In closing, the court stated "a forced sale would be warranted" "[u]nder the law as it was in 2020."

7.

seventy-five thousand dollars ($75,000), as adjusted pursuant to Section 703.150.

"(B) As used in this paragraph, the following terms have the following meanings:

"(i) 'Financial institution' means a financial institution, as defined in Section 680.200.

"(ii) 'Student loan debt' means debt based on any loan made to finance postsecondary education expenses, including tuition, fees, books, supplies, room and board, transportation, and personal expenses. Student loan debt includes debt based on a loan made to refinance a student loan, but does not include debt secured by the debtor's principal place of residence at the time it was incurred."

Under section 680.200, a " '[f]inancial institution' means a state or national bank, state or federal savings and loan association or credit union, or like organization, and includes a corporation engaged in a safe deposit business."

## II.  Analysis

a. *Whether Smith incurred "consumer debt" within the meaning of section 699.730*

On appeal, Davis Boat contends section 699.730's definition of consumer debt as "debt incurred by an individual primarily for personal, family or household purposes" "is latently ambiguous based on extrinsic evidence: the statute's legislative history." On the other hand, Smith—proceeding in pro. per.—urges us to "uphold the trial court's decision" in view of the "plain and unambiguous" terms of section 699.730.

" 'Questions of statutory interpretation . . . present questions of law, which we review de novo.' [Citation.] 'Because the interpretation and application of a statute are questions of law, an appellate court is not bound by the trial judge's interpretation.' [Citation.] Instead, 'we undertake our own interpretation of the determinative statute and assess any claims raised by the parties completely anew.' [Citation.]" (*California State*

8.

*University, Fresno Assn., Inc. v. County of Fresno* (2017) 9 Cal.App.5th 250, 265-266 (*Cal. State Fresno*).)

" 'In ascertaining the meaning of a statute, we look to the intent of the Legislature as expressed by the actual words of the statute' [citation], 'giving them a plain and commonsense meaning' [citation]. 'We examine the language first, as it is the language of the statute itself that has "successfully braved the legislative gauntlet." [Citation.] "It is that [statutory] language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's 'legislative history.' " [Citation.]' [Citation.]" (*Cal. State Fresno, supra,* 9 Cal.App.5th at p. 266; see *Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 432 (*Siskiyou*) ["A statute is *the* mechanism for exercising legislative power. Thus, statutory language is *the* measure of its meaning, and not some progenitor, be it the author of a precursor bill, or detritus from the legislative process."].)

" 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.]" (*Cal. State Fresno, supra,* 9 Cal.App.5th at p. 266.) "Only if two candidates of meaning each plausibly account for the statutory language can it be said that a statute is ambiguous." (*Siskiyou, supra,* 237 Cal.App.4th at p. 450.) " ' "An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence." [Citation.]' " (*Id.* at p. 433.) "[W]here a party argues a latent ambiguity exists, a court may not simply adopt a literal construction and end its inquiry." (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1495 (*Coburn*).)

" ' "A claim of latent ambiguity requires a provisional examination of extrinsic matters to make the judgment whether the claim is tenable." ' [Citation.]" (*Siskiyou*, *supra*, 237 Cal.App.4th at p. 432.) "A latent ambiguity exists where ' "some extrinsic evidence creates a necessity for interpretation or a choice among two or more possible meanings." [Citation.]' [Citation.] Such a necessity is present where a literal construction would frustrate rather than promote the purpose of the statute. [Citations.] Another example of such a necessity is presented where a literal construction would produce absurd consequences. [Citation.]" (*Coburn*, *supra*, 133 Cal.App.4th at p. 1495, italics omitted; see *Switzer v. Wood* (2019) 35 Cal.App.5th 116, 129 (*Switzer*) ["A court is not required to follow the plain meaning of a statute when to do so would frustrate the manifest purpose of the legislation as a whole or otherwise lead to absurd results."].) Establishing necessity "requires much more than showing that troubling consequences may potentially result if the statute's plain meaning were followed or that a different approach would have been wiser or better." (*Switzer*, *supra*, at p. 129.) "To justify departing from a literal reading of a clearly worded statute, the results produced must be so unreasonable the Legislature could not have intended them." (*In re D.B.* (2014) 58 Cal.4th 941, 948.) "Moreover, our courts have wisely cautioned that the absurdity exception to the plain meaning rule 'should be used most sparingly by the judiciary and only in extreme cases else we violate the separation of powers principle of government. [Citation.] We do not sit as a "super-legislature." [Citation.]' [Citation.]" (*Switzer*, *supra*, at p. 129.)

"When a court reviews extrinsic material to determine whether a latent ambiguity exists, it must be careful not to rewrite an unambiguous statute by inserting qualifying language." (*Coburn*, *supra*, 133 Cal.App.4th at p. 1495.) " 'In determining whether language is ambiguous it is essential to tether extrinsic evidence to particular language . . . .' " (*Siskiyou*, *supra*, 237 Cal.App.4th at p. 433, italics omitted.) " '[I]f " 'the language of the [statute]' " cannot carry the meaning ascribed to it by the party claiming

10.

an ambiguity, " 'the case is over.' " ' [Citation.]" (*Ibid.*, fn. omitted.) "[A] court should not create a latent ambiguity where none exists." (*Coburn*, *supra*, at pp. 1495-1496.)

As noted, section 699.730, subdivision (a) defines "consumer debt" as "debt incurred by an individual primarily for personal, family, or household purposes." "Personal" means "[o]f or pertaining to a particular person; private; one's own . . . ." (American Heritage Dict. (2d college ed. 1985) p. 925; see *Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1, 30 ["In scrutinizing the words of a statute, courts generally give them their usual, ordinary meaning, which in turn may be obtained by referring to a dictionary."].) "Family" refers to "[a] fundamental social group in society consisting esp. of a man and woman and their offspring" or "[a]ll the members of a household under one roof." (American Heritage Dict., *supra*, at p. 488.) "Household" refers to "[a] domestic establishment including the members of a family and others who live under the same roof." (*Id.* at p. 625.) Thus, a debt incurred for business or commercial reasons would not be a debt incurred for "personal, family, or household purposes." Other courts have reached the same conclusion in cases involving the interpretation of "personal, family, or household purposes" as utilized in other statutory schemes. (See, e.g., *Kalta v. Fleets 101, Inc.* (2019) 41 Cal.App.5th 514, 517 [Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.)]; *Weber v. Langholz* (1995) 39 Cal.App.4th 1578, 1583-1584 [Economic Growth, Regulatory Relief, and Consumer Protection Act formerly known as the Truth In Lending Act (15 U.S.C. § 1601 et seq.)]; *James Talcott, Inc. v. Gee* (1968) 266 Cal.App.2d 384, 386-387 [Unruh Act (Civ. Code, § 1801 et seq.)]; see also Fin. Code, § 22502 [" 'Commercial loan' means a loan of a principal amount of five thousand dollars ($5,000) or more, or any loan under an open-end credit program, . . . the proceeds of which are intended by the borrower for use primarily for other than personal, family, or household purposes."].) Nothing on the face of section 699.730 indicates the Legislature intended to limit "consumer debt" solely to "debt incurred to purchase goods or services reasonably necessary for [a debtor's]

11.

support or maintenance of that of his dependents." (Cf. 11 U.S.C. § 523, subd. (a)(2)(C)(i)(I), (ii)(II).) If the Legislature had so intended, it would have included language to that effect. (See *La Jolla Group II v. Bruce* (2012) 211 Cal.App.4th 461, 476 [" ' " 'An intent that finds no expression in the words of the statute cannot be found to exist.' " ' "].)

Notwithstanding the plain meaning of the statute, Davis Boat suggests "consumer debt" is latently ambiguous because (1) the "ASSEMBLY COMMITTEE ON JUDICIARY" and "SENATE JUDICIARY COMMITTEE" reports on Assembly Bill No. 2463 show "the Legislature intended the statute to protect low income homeowners from serious harm by preventing forced sale of their homes due to consumer debts, totaling only a few thousand dollars for basic needs and did not intend it to protect wealthy judgment debtors so that they could escape their obligations"; and (2) "literally constru[ing] the statute's definition of consumer debt . . . would result in absurd consequences which the Legislature did not intend, debt protection for Smith's purchase of a luxury custom built race boat and trailer."

According to the legislative reports cited by Davis Boat, California law (as it then existed) "permits a creditor who has obtained a judgment against a debtor to apply for a forced sale of the debtor's principal place of residence, even where the home was never offered as collateral" and "no matter how small [the debt], as long as the judgment debtor has sufficient equity in their residence to recoup the homestead exemption." "[F]orced home sales are no longer reserved for extreme cases, but instead are frequently used (or threatened) to satisfy extremely small debts." This practice "is especially problematic considering [California's] current housing and homelessness crisis" and "what is anticipated to be a historic amount of unpaid consumer debt as a result of the current COVID-19 epidemic." Furthermore, "[f]oreclosing on homes due to . . . debt is disruptive to low income communities," "communities of color," "seniors," and "people with disabilities." Assembly Bill No. 2463 was "crafted to accomplish the goal[] of

12.

moving the state away from current law allowing a consumer's home to be *de facto* security for every debt they incur."

These reports reveal the primary objective of Assembly Bill No. 2463 is to curtail a particular method of debt collection that (1) has been increasingly used in an abusive manner, i.e., to force or threaten a home sale to satisfy even relatively small debts; (2) would exacerbate the state's housing and homelessness crisis in the midst of a global pandemic; and (3) has disproportionately affected marginalized communities. While these reports list "a variety of sources" of "[d]ebts in collections," "including medical bills, credit cards, auto loans, student loans, and utility bills," they do not suggest—as Davis Boat would have us believe—that only a homeowner who incurs debts "for goods or services reasonably necessary for [his] support or maintenance or that of his dependents" or "to purchase essential items" (italics omitted) may be entitled to protection from the forced sale of his or her principal residence.[4] Moreover, even though Smith unquestionably owes more than "a few thousand dollars" and even if we assume, arguendo, he is a "wealthy judgment debtor[]" who is not a member of one of the marginalized groups identified in Assembly Bill No. 2463, "the fact that ' " 'a statute can be applied in situations not expressly anticipated by [the Legislature] does not demonstrate ambiguity. It demonstrates breadth.' " ' [Citations.]" (*Siskiyou*, *supra*, 237 Cal.App.4th at p. 433.) We do not believe the purpose of Assembly Bill No. 2463 is frustrated simply because the language approved by the Legislature—i.e., " 'consumer debt' means debt incurred by an individual primarily for personal, family, or household purposes" (§ 699.730, subd. (a))—is broad and inclusive. That judgment debtors who

---

[4] Indeed, it is not uncommon for credit cards to be used for nonessential items. (See, e.g., *In re Hashemi* (9th Cir. 1996) 104 F.3d 1122, 1126 [six-week family trip to France, side-trip to French Riviera, cosmetics, expensive meals, and "other luxury items"]; *Danko v. O'Reilly* (2014) 232 Cal.App.4th 732, 743 [wine and "luxury vacations"].)

13.

owe substantial sums of money may benefit from the statute does not mean those whose debts are smaller in comparison and who are members of vulnerable groups cannot avail themselves of the same. We are more inclined to believe the Legislature defined "consumer debt" expansively to ensure a large initial pool of candidates eligible for relief.

Finally, we reject Davis Boat's assertion a literal construction of section 699.730 would allow Smith and others like him to "escape their obligations." As expressly stated in the aforementioned legislative reports, section 699.730 "does not affect other means available to creditors for collecting on judgment debts, such as wage garnishment, seizures of the judgment debtor's other property (including homes other than the principal place of residence), or seizing funds from the judgment debtor's bank account."

b. *Whether section 699.730 is unconstitutional*

Davis Boat challenges the constitutionality of section 699.730 for the first time on appeal.[5] "The constitutionality of a statute is a question of law, which we review de novo." (*Vergara v. State of California* (2016) 246 Cal.App.4th 619, 642.) " 'The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.' [Citations.]" (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 10-11.)

---

[5] "Ordinarily, a party may not change the theory of his case for the first time on appeal. [Citation.] However, parties have been permitted to change their theory on appeal where the issue is purely a question of law presented on undisputed facts. [Citations.]" (*Frink v. Prod* (1982) 31 Cal.3d 166, 170.) Whether a statute is constitutional is a question of law. (See, e.g., *People v. Hines* (1997) 15 Cal.4th 997, 1061 [Pen. Code, § 69]; *Taking Offense v. State of California* (2021) 66 Cal.App.5th 696, 705 [Health & Saf. Code, § 1439.51, subd. (a)(3), (5)].) "A question of law is not subject to the doctrine of forfeiture." (*In re P.C.* (2006) 137 Cal.App.4th 279, 287.) "Because the principle of forfeiture does not apply to a question of law, it is inappropriate for the purpose of defeating an inquiry into the constitutionality of a statute." (*Ibid.*)

### i. Contract clause

"The retrospective application of a statute may be unconstitutional . . . if it impairs the obligation of a contract." (*Rosefield Packing Co. v. Superior Court* (1935) 4 Cal.2d 120, 122; see U.S. Const., art. I, § 10, cl. 1 ["No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."]; Cal. Const., art. I, § 9 ["A . . . law impairing the obligation of contracts may not be passed."].) " ' "The obligation of a contract is 'the law which binds the parties to perform their agreement' " ' " (*Brown v. Ferdon* (1936) 5 Cal.2d 226, 230) and " ' "[t]he obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them" ' " (*ibid.*). "The obligation of a contract has reference alone to the rights of the parties arising thereunder and not to any remedy for their enforcement." (*Lincoln v. Superior Court* (1934) 2 Cal.2d 127, 129.) " 'Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the [state] shall direct.' " (*Brown v. Ferndon*, *supra*, at p. 230.)

On appeal, Davis Boat contends "the trial court's retroactive application of section 699.730 and its resulting denial of [its] application for a sale order unconstitutionally impairs the obligation of a contract by depriving Davis Boat of its legal remedy to enforce its preexisting judgment through a forced sale of Smith's dwelling." We disagree. "It is well settled that while, in a general sense, the laws in force at the time a contract is made enter into its obligation, parties have no vested right in the particular remedies or modes of procedure then existing. It is true [a] Legislature may not withdraw all remedies, and thus, in effect, destroy the contract; nor may it impose such new restrictions or conditions as would materially delay or embarrass the enforcement of rights under the contract according to the usual course of justice as established when the contract was made. Neither could be done without impairing the obligation of the contract. But it is equally well settled that [a] Legislature may modify or change existing remedies or prescribe new modes of procedure, without impairing the obligation of

15.

contracts, provided a substantial or efficacious remedy remains or is given, by means of which a party can enforce his rights under the contract." (*Oshkosh Waterworks Co. v. Oshkosh* (1903) 187 U.S. 437, 439; accord, *Severns v. Union Pacific Railroad Co.* (2002) 101 Cal.App.4th 1209, 1222.) Here, while section 699.730 generally prohibits the forced sale of a judgment debtor's principal place of residence to satisfy a consumer debt, the provision does not preclude the seizure and sale of a debtor's personal property and real property other than the principal place of residence. (See § 695.010, subd. (a) ["Except as otherwise provided by law, all property of the judgment debtor is subject to enforcement of a money judgment."].) Other methods of recovery—such as wage garnishment (see § 706.010 et seq.) and levying upon deposit accounts (see § 700.140)— are left intact. Since section 699.730 does not "change any obligations in the contract" (*Severns v. Union Pacific Railroad Co.*, *supra*, at p. 1222), " 'take away all remedies' " (*ibid.*), or " 'substantially restrict the remedies as practically to destroy the right' " (*ibid.*), we cannot find the statute unconstitutionally impairs the obligation of contract.

        ii.  Equal protection clause

"Both the state and federal Constitutions extend to persons the equal protection of law." (*People v. Chatman* (2018) 4 Cal.5th 277, 287 (*Chatman*); see U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) "At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification. [Citation.] The extent of justification required to survive equal protection scrutiny in a specific context depends on the nature or effect of the classification at issue. Unequal treatment based on a suspect classification such as race is subject to ' "the most exacting scrutiny." ' [Citation.] So is treatment affecting a fundamental right. [Citation.]" (*Chatman*, *supra*, at p. 288.) "Yet where the law challenged neither draws a suspect classification nor burdens fundamental rights, the question we ask is different. We find a denial of equal protection only if there is no rational relationship between a disparity in treatment and some legitimate government purpose. [Citation.] This core

16.

feature of equal protection sets a high bar before a law is deemed to lack even the minimal rationality necessary for it to survive constitutional scrutiny. Coupled with a rebuttable presumption that legislation is constitutional, this high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair. [Citations.]" (*Id.* at pp. 288-289, italics omitted.)

"In order to decide whether a statutory distinction is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection, we typically ask two questions. We first ask whether the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner. [Citation.] If we deem the groups at issue similarly situated in all material respects, we consider whether the challenged classification ultimately bears a rational relationship to a legitimate state purpose. [Citation.]" (*Chatman*, *supra*, 4 Cal.5th at p. 289.) " 'This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in " 'rational speculation' " as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record." ' [Citation.] To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity. [Citations.] If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' [Citations.]" (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.)

On appeal, Davis Boat challenges section 699.730, subdivision (b)(7), which sets forth a " 'carve out for high-priced debts owed to financial institutions, except for student loans.' [Citation.]" (Fn. omitted.) The company contends "there is no rational basis for treating creditors, such as Davis Boat, differently from financial institutions for purposes

17.

of high-priced consumer debt transactions under the statute." We disagree. Although we recognize Davis Boat "financed a high-priced consumer transaction" "akin to a financial institution" and "creditors who are not financial institutions . . . have the same interest in recouping monies owed for high-priced consumer transactions," a plausible basis exists justifying section 699.730's exemption for financial institutions. Unlike " 'the business of a merchant' " (*State Savings etc. Bank v. Anderson* (1913) 165 Cal. 437, 442), which involves " 'matter[s] of private concern only' " (*ibid.*), financial institutions such as banks "are engaged in a business affected with a public interest . . . , which clearly warrants special classification" (*Rainey v. Michel* (1936) 6 Cal.2d 259, 272). More than a century ago, our Supreme Court acknowledged:

> " 'Banks are indispensable agencies through which the industry, trade and commerce of all civilized countries and communities are now carried on. The banker is the universal broker over whose counter the exchanges of supply and demand are, in the final analysis, effected. The capital which he has invested and the returns which he receives upon it are insignificant in importance relative to the advantages which society at large derives from the conduct of the banking business . . . . [F]or all purposes of legislative regulation and control [banking] may be said to be "affected with a public interest." The public patronage which the banker invites and receives is of such a character that he becomes in a just sense a trustee of the fiscal affairs of the people and of the state.' " (*State Savings etc. Bank v. Anderson*, *supra*, 165 Cal. at p. 442.)

Given financial institutions "exert great influence upon the economic health of the nation" (*Kruger v. Wells Fargo Bank* (1974) 11 Cal.3d 352, 365, fn. omitted), their wellbeing is of paramount importance. (See, e.g., *Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 922 ["When financial markets nearly collapsed in the late summer and early fall of 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 . . . . The centerpiece of this act was the federal Troubled Asset Relief Program (TARP) which . . . provid[ed] a massive infusion of liquidation to the banking system . . . ."].) Therefore, we cannot deem a statutory exemption that allows financial institutions (but not other creditors) to force the sale of a judgment debtor's principal

18.

place of residence to satisfy a high-priced debt "so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection . . . ." (*Chatman*, *supra*, 4 Cal.5th at p. 289.)[6]

## **<u>DISPOSITION</u>**

The postjudgment order is affirmed. Costs on appeal are awarded to defendant and respondent Weldon Smith, Jr.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

SNAUFFER, J.

---

[6] Having concluded section 699.730's definition of "consumer debt" is not latently ambiguous and the statute is not unconstitutional, we need not address Smith's argument "[t]he automatic homestead exemption applies to [his] Residence."